# IN THE SUPREME COURT OF IOWA

No. 42 / 04-0950

Filed May 12, 2006

**IN RE THE MARRIAGE OF DONNA LEE
SULLINS AND RAYMOND W. SULLINS**

**Upon the Petition of
DONNA LEE SULLINS,**

Appellee,

**And Concerning
RAYMOND W. SULLINS,**

Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Sherman W. Phipps, Judge.

Appeal from district court's division of property in dissolution case.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND REMANDED.**

Raymond W. Sullins, West Des Moines, pro se.

Andrew B. Howie of Hudson, Mallaney & Shindler, P.C., West Des Moines, for appellee.

**CADY, Justice.**

Ray Sullins seeks further review of a decision by the court of appeals affirming the property-distribution and attorney-fee provisions of a district court decree for dissolution of marriage. He argues: (1) the division of a retirement account was inequitable, (2) the court did not properly consider his premarital retirement savings, (3) the division of the parties' other assets and liabilities was inequitable, (4) he should not have been ordered to pay attorney fees, and (5) the court should have ordered a postsecondary education subsidy for the parties' daughter. We vacate the decision of the court of appeals and affirm the decree of the district court as modified.

## I. Background Facts and Proceedings

Ray and Donna Sullins were married on November 25, 1978. Donna was a teacher in the West Des Moines school district at the time, and Ray worked as a lawyer in the office of the Iowa Attorney General. Donna had a bachelor's degree in music education. Ray owned a house, which he contributed to the marriage. Donna contributed a car and various household items to the marriage. She had also participated in the Iowa Public Employees Retirement System (IPERS) for eight years prior to the marriage, and had acquired a tax-sheltered annuity (TSA). Ray had a variety of personal property as well as an IPERS account from his employment with the attorney general. A year into the marriage, Ray withdrew his IPERS funds and used them as a down payment on a new home. Around the same time, Ray left the attorney general's office and began to work as a lobbyist.

Donna and Ray had three children: Deborah, Stephen, and Matthew. Deborah was born in 1981, Stephen was born in 1984, and Matthew was born in 1986. Donna continued to work during this time

on a part-time basis, and later returned as a fulltime teacher. Ray transitioned from lobbying into the private practice of law. Donna also took night and weekend classes, which enabled her to obtain her masters degree in 2000.

After that time, the marriage began to deteriorate. Sadly, Donna and Ray were confronted with more than their fair share of agony. Ray had a series of problems in his professional career that culminated in the revocation of his license to practice law in Iowa in 2002. That same year, Donna and Ray faced a parent's worst nightmare when Stephen, their oldest son, tragically died. They also did not escape financial difficulties. Their home was put up for tax sale on two occasions.

Donna filed for divorce in February 2003. At the time of the trial in January 2004, Donna was fifty-six, and Ray was fifty-eight. Their daughter, Deborah, was twenty-two and was a fulltime student at Northwestern College in St. Paul, Minnesota. She was in her final year of school. Matthew was eighteen and was a senior at Waukee High School. Donna was teaching fulltime, making approximately $54,000 per year. Ray was working in sales, making approximately $81,000 per year.

The district court entered its decree in April 2004. The court found Donna's annuity, which she funded entirely before the marriage, and her eight years of premarital IPERS contributions were not "part of the marital assets" and awarded both to her. The annuity was valued at $4872. The court valued the IPERS account at $57,081.47. The court awarded $35,247.81 of it to Donna, and $21,833.66 of it to Ray.[1]

---

[1]The court set aside eight thirty-fourths (23.5%) of the IPERS account ($13,414.14) for Donna as premarital property. Eight was the number of Donna's premarital contribution years, and thirty-four was the number of years she had contributed up to the divorce. The court then divided the remainder of the IPERS account ($43,667.33) equally between Donna and Ray, awarding each $21,833.67.

Including the premarital retirement savings, which the court treated as Donna's separate property, the court awarded Donna a total of $275,198.31 in assets (consisting mainly of the house and retirement accounts) and awarded Ray $57,236.16 in assets. The court ordered Donna to be responsible for $87,777.50 of the marital debt, and Ray to be responsible for $17,454.50 of the debt (in addition to a $750,000 malpractice judgment against him). To equalize the disparate equity awarded to Donna, the court ordered her to pay Ray $61,676.53. The court also ordered Ray to pay $7500 of Donna's attorney fees.

Ray appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the decree in its entirety. Ray sought, and we granted, further review.

## II.    Standard of Review

We review dissolution cases de novo. *In re Marriage of Schriner*, 695 N.W.2d 493, 495 (Iowa 2005) (citing *In re Marriage of Benson*, 545 N.W.2d 252, 253 (Iowa 1996); Iowa R. App. P. 6.4). "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). We review the district court's award of attorney fees for an abuse of discretion. *Id.* (citing *In re Marriage of Benson*, 545 N.W.2d at 258).

## III.    Premarital Property

Iowa is an equitable distribution state. *In re Marriage of Schriner*, 695 N.W.2d at 496. This "means that courts divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in an equitable manner in light of the particular circumstances of the parties." *Id.* (citing *In re Marriage of McNerney*, 417 N.W.2d 205, 207 (Iowa 1987)). All property of the

marriage that exists at the time of the divorce, other than gifts and inheritances to one spouse, is divisible property. *Id.* (citing Iowa Code § 598.21(1) (2003)). Importantly, "the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *Id.* (citing *In re Marriage of Brainard*, 523 N.W.2d 611, 616 (Iowa Ct. App. 1994)).

> Property brought into the marriage by a party is merely a factor to consider by the court, together with all other factors, in exercising its role as an architect of an equitable distribution of property at the end of the marriage.

*Id.* (citing Iowa Code § 598.21(1)(*b*)).

In this case, the district court set aside Donna's annuity as a "premarital asset[]" and found that it "should not be considered part of the marital assets." This finding was contrary to our distribution scheme in Iowa. The property is part of the divisible estate, just as is property acquired during the marriage. *Id.* The trial court may place different degrees of weight on the premarital status of property, but it may not separate the asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage.

For the same reason, we reject Ray's argument that he should be entitled to a "credit" for the property and retirement savings he owned before the marriage and integrated into the marital coffers. While this is a factor to consider in achieving an overall equitable distribution, *see* Iowa Code § 598.21(1)(*b*), it is one factor among many, *see id.* (*a*)-(*m*). It does not automatically require Donna's share of the property to be reduced as a reimbursement for Ray's premarital contributions. We turn now to specifically consider the district court's treatment of Donna's IPERS pension.

## IV. IPERS

Pensions are divisible marital property. *See In re Marriage of Branstetter*, 508 N.W.2d 638, 640 (Iowa 1993) ("Pensions in general are held to be marital assets, subject to division in dissolution cases, just as any other property." (Citations omitted.)); *see also* Iowa Code § 598.21(1)(*i*) (stating vested and unvested pensions are circumstances to be considered in equitably dividing property). There are two accepted methods of dividing pension benefits: the present-value method and the percentage method. *In re Marriage of Benson,* 545 N.W.2d at 255; 24 Am. Jur. 2d *Divorce and Separation* §§ 585-86, at 747-50 (1998). Additionally, there are two main types of pension plans: defined-benefit plans and defined-contribution plans. *In re Marriage of Benson,* 545 N.W.2d at 254.

Although both methods of dividing pension benefits can be used with both types of pension plans, it is normally desirable to divide a defined-benefit plan by using the percentage method. The present-value method requires the present value of the benefits to be determined before allocating a portion of the benefits to the pensioner's spouse. *In re Marriage of Benson,* 545 N.W.2d at 255 (citing *In re Marriage of Branstetter,* 508 N.W.2d at 642). Present value derived under this method "represents the 'restatement in "current dollars" of a payment or series of payments to a current lump sum equivalent.'" Dylan A. Wilde, Note, *Obtaining an Equitable Distribution of Retirement Plans in a Divorce Proceeding,* 49 S.D. L. Rev. 141, 150 (2003) [hereinafter Wilde] (quoting Gary A. Schulman & David I. Kelly, *Learning from the Pension Experts Dividing Pensions in Divorce* (1996)). Yet, the determination of present value of a defined-benefit plan is a complicated process that requires the use of actuarial science. *In re Marriage of Benson,* 545 N.W.2d at 255

(citing *In re Marriage of Mott*, 444 N.W.2d 507, 511 (Iowa Ct. App. 1989));
*see also Thompson v. Thompson*, 438 A.2d 839, 841 (Conn. 1981) ("The
present value of a pension benefit may be arrived at by using generally
[sic] actuarial principles to discount for mortality, interest and the
probability of the employee remaining with the employer until retirement
age."); *see* 24 Am. Jur. 2d *Divorce and Separation* § 586, at 748 (stating
the present-value method "requires discounting to present value and
further discounting to account for the probability of death before
qualification for benefits and for vesting as well as consideration of the
employee's life expectancy as a retiree").[2]

The complicated nature of determining the present value of a
defined-benefit plan and dividing the benefits, as well as the economic
difficulty for a pensioner to pay a lump-sum amount representing the
present value of a defined-benefit plan, normally makes the second
method of division and distribution of pensions much more attractive for

---

[2]When the plan at issue is a defined-contribution plan, like a 401(k), the determination of the present value of the benefits and the distribution is less complicated. *In re Marriage of Benson*, 545 N.W.2d at 256 n.1.

> "The value of such plans is the amount of accumulated contributions
> plus interest as of the valuation date. It follows that the value of the
> [marital] interest in defined contribution plans is the amount of
> contributions made during [the marriage] plus accumulated interest on
> these contributions."

*Id.* (quoting Phoebe Carter & John Myers, *Division and Distribution of the Community Interest in Defined Benefit Pensions:* Schweitzer *Reconsidered*, 18 N.M. L. Rev. 95, 98 (1988)); *see also* Elizabeth Barker Brandt, *Valuation, Allocation, and Distribution of Retirement Plans at Divorce: Where Are We?*, 35 Fam. L.Q. 469, 479 (2001) [hereinafter Barker Brandt] (stating a defined-contribution plan "is worth the combined value of the contributions to it and the growth and earnings on those contributions"); Wilde, 49 S.D. L. Rev. at 152 ("When the retirement plan is a defined contribution plan that is vested, there is no need to discount the contributions made by the employee to obtain the present value of the retirement plan. Instead, the amount of the employee and/or employer contributions and any accumulated earnings in the employee's individual account reflects the actual present value."). It appears the district court treated Donna's IPERS as a defined-contribution plan.

defined-benefit plans. Under the second method to divide and distribute a pension plan, the percentage method, the court awards a spouse a percentage of the pension payable in the future at the time the benefits mature.

IPERS is, of course, a defined-benefit plan. *See* Iowa Code § 97B.49A(3) ("For active or inactive vested members retiring on or after July 1, 1994, with four or more complete years of service, a monthly benefit shall be computed which is equal to one-twelfth of an amount equal to the applicable percentage of the three-year average covered wages multiplied by a fraction of years of service."); *In re Marriage of Benson*, 545 N.W.2d at 254 ("[I]n a defined benefit plan the future benefit is specified in advance by a formula."). The plan uses a *"percentage of earnings per year of service* formula, which provides a benefit that is related to the employee's earnings and length of service." *In re Marriage of Benson*, 545 N.W.2d at 254-55 (citing Steven R. Brown, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post-judgment Partition Actions: Cures for the Inequities in* Berry v. Berry, 39 Baylor L. Rev. 1131, 1146 (1987)). Donna is a vested member. *See* Iowa Code § 97B.1A(25)(*a*)(4) (stating a member is vested if he or she "[h]as completed at least four years of service").

In this case, the district court divided the IPERS pension based on the current value of Donna's personal contributions to the plan over the years of the marriage at the time of the divorce. *See id.* § 97B.11 ("Each employer shall deduct from the wages of each member of the system a contribution in the amount of three and seven-tenths percent of the covered wages paid by the employer, until the member's termination from employment. The contributions of the employer shall be in the amount of five and seventy-five hundredths percent of the covered wages

of the member."). This value was not based on actuarial evidence. Instead, this value was obtained from information made available to Donna showing the amount of her personal contributions over the years and the interest earned on her personal contributions. However, the present value of her IPERS plan is more than the present value of her contributions. *See In re Marriage of Scheppele*, 524 N.W.2d 678, 679 (Iowa Ct. App. 1994) ("We note that if we do not include Marcia's employer's contributions, the present value of Marcia's contributions and accrued interest in her IPERS plan is $26,000. However, the value of Marcia's IPERS pension is not limited to her vested contributions."); *In re Marriage of Johnston*, 492 N.W.2d 206, 208 (Iowa Ct. App. 1992) ("The exact value of Karin's IPERS pension is not ascertainable. We, like the district court, will not assume the value is limited to Karin's vested contributions. However, we disagree with Karin's argument that a remand to take actuarial testimony to value the pension is necessary."). In fact, the amount of Donna's IPERS contributions has no relation to the present value of her future *benefits* because the contributions are not used to calculate benefits. Instead, the benefits are ultimately tied to a percentage of the employee's average *wages*. *See* Iowa Code § 97B.49A(3) ("For active or inactive vested members retiring on or after July 1, 1994, with four or more complete years of service, a monthly benefit shall be computed which is equal to one-twelfth of an amount equal to the applicable percentage of the three-year average covered wages multiplied by a fraction of years of service."). Thus, the district court's valuation and distribution of Donna's IPERS plan fell far short of our accepted methods and was inequitable. Without actuarial evidence, the district court could not have divided the retirement plan based on the present value of Donna's future benefits. *See In re Marriage of Johnston,*

492 N.W.2d at 208 ("The exact value of Karin's IPERS pension is not ascertainable. We, like the district court, will not assume the value is limited to Karin's vested contributions."). On our de novo review, we conclude that the better way to divide and distribute the IPERS account is to use the percentage method normally applicable to cases involving IPERS. *See In re Marriage of Scheppele*, 524 N.W.2d at 680 (modifying decree, where present value of IPERS account was not ascertainable on the record, to order a QDRO using the percentage method to divide the future benefits when received).

Under the percentage method, the non-pensioner spouse is awarded a percentage (frequently fifty percent) of a fraction of the pensioner's benefits (based on the duration of the marriage), by a qualified domestic relations order (QDRO), which is paid if and when the benefits mature. *In re Marriage of Benson*, 545 N.W.2d at 255 (citing *In re Marriage of Branstetter*, 508 N.W.2d at 642). The fraction represents the portion of the pension attributable to the parties' joint marital efforts. *Id.* The numerator in the fraction is the number of years the pensioner accrued benefits under the plan during the marriage, and the denominator is the total number of years of benefit accrual. *Id.* (citing *In re Marriage of Mott*, 444 N.W.2d at 511); *accord* Barker Brandt, 35 Fam. L.Q. at 472-73.

Applying this method, we modify the decree to provide for a QDRO to divide Donna's monthly IPERS benefits when received under the following formula:

$$\text{Ray's Share} = 50\% \times \frac{\text{\# of quarters Donna contributed to IPERS while married[3]}}{\text{\# of quarters Donna contributed to IPERS before retirement}} \times \text{Monthly Benefits}$$

---

[3]IPERS shall use the number of quarters in each year covered during the marriage period of November 25, 1978 through April 30, 2004.

This modification will require further adjustment of the district court's property distribution. We will address the necessary adjustment after considering the distribution of the other specific items with which Ray takes issue.

### V. Other Property

### A. Trust Account

First, Ray complains the distribution scheme by the district court gave him a credit of $7687 for funds in a trust account that did not belong to him. Ray testified that the money represented client funds he obtained as a lawyer that have never been withdrawn from the trust account. Client funds in a trust account are property of the client, not the lawyer. *See Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998). Only "property of the parties" is divisible in a dissolution. Iowa Code § 598.21(1). Thus, the district court erred in considering the trust account funds in its property distribution.

### B. 2000 Saturn

Ray also contends the district court erred in considering the Saturn vehicle to be Ray's property and giving him a credit of $6250 (minus a $3366 loan) representing the value of the vehicle. We agree. It was undisputed that Ray purchased the car for Deborah. It is owned by Deborah and titled in her name. Consequently, it should have been excluded from the divisible estate. *See id.* (stating "the court shall divide the property *of the parties*" (emphasis added)).

### C. 1992 Buick

Ray argues the district court overvalued the 1992 Buick Park Avenue awarded to him. The district court valued it at $3000. Ray claims it was worth only about $2000. Donna valued it at $4000. There was no other evidence offered on the value of the car, and we

consequently defer to the judgment of the district court. *See In re Marriage of Witten*, 672 N.W.2d at 773 ("Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses."); *In re Bare's Marriage*, 203 N.W.2d 551, 554 (Iowa 1973) (stating we will not disturb the district court's valuation of assets if it was "within the permissible range of the evidence").

### D.  Rowat Cut Stone Debt

We have said "that the allocation of marital debts inheres in the property division." *In re Marriage of Johnson*, 299 N.W.2d 466, 467 (Iowa 1980).  In this case, the district court held Ray responsible for the entire $3042 debt to Rowat Cut Stone.  Ray argues the loan was used to pay family expenses and therefore should be divided between him and Donna.  Even though a debt may have been incurred by a party for family expenses, it is not inequitable to order that party to be responsible for the entire amount of the debt as long as the overall property distribution is equitable.  Debts of the parties normally become debts of the marriage, for which either party may be required to assume the responsibility to pay.  24 Am. Jur. 2d *Divorce and Separation* § 571, at 730.  However, we recognize that Donna will be responsible for most of the marital debts, and that Ray's earning capacity is greater than Donna's.  *See* Iowa Code § 598.21(1)(*f*), (*i*), (*k*).  These factors, as well as all other factors, including the allocation of all the debt between the parties, are considered in determining the equitable division of all property and debts.

### E.  Debt to Ray's Brothers

Ray claims he borrowed money from his father before his father died, and that he was required to pay his brothers $18,000 to satisfy this

debt. He claims the debt should have been divided between the parties. It was undisputed that Ray's father loaned Ray and Donna money. The evidence included a letter from Ray's father, dated June 27, 1988, indicating Ray and Donna owed him $26,100 at 9% interest. However, Donna testified she thought the debt had been paid, and she was unaware of Ray's obligation to his brothers. The district court found the evidence did not support Ray's claim, and we decline to disturb the district court's credibility judgment. *See In re Marriage of Witten*, 672 N.W.2d at 773 ("Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses.").

**F.    Ray's Income Tax Liability**

Ray asserts Donna should be responsible for some of his income tax liability for 2003 and 2004. Donna filed separate tax returns in 2003 and 2004. Ray owed $14,000 in income taxes for these years because he failed to pay his quarterly self-employment taxes.

We conclude it would be inequitable for Donna to share in the responsibility for Ray's tax obligation under the circumstances. Ray's tax problems are self-imposed and largely the result of imprudent business practices adopted to minimize the amount of funds available to satisfy a personal judgment against him. While Ray neglected his tax obligations, Donna paid her tax obligations from her wages. *Cf. Duckett v. Duckett*, 539 N.E.2d 556, 557 (Mass. App. Ct. 1989) (holding "the judge could reasonably decide to leave each marital party to his or her debts in view of the finding that the husband had been profligate in incurring personal and business debts," while the wife had been "fiscally responsible"); *Carter v. Carter*, 626 N.W.2d 576, 580 (Neb. 2001) ("[A]n innocent spouse who has filed separate tax returns, and paid his or her taxes in a timely

fashion, should not be forced to share in any statutory penalties for the late filings of a dilatory spouse." (citing *Meints v. Meints*, 608 N.W.2d 564 (Neb. 2000)). The tax debt assigned to Ray, which ultimately inheres in the division of all the property, is only part of the overall debt distribution, and the particular circumstances of the tax obligation become a factor that benefits Donna in ultimately determining an equitable distribution of all the property.

### G. Modified Property Distribution

The foregoing conclusions regarding the district court's property distribution require us to modify the overall property distribution. We direct that Donna's IPERS be divided under the percentage method using a qualified domestic relations order. We also remove the trust account funds and Deborah's Saturn vehicle from the distribution scheme. In order to make the property division equitable, we find Donna should be responsible for the entire amount of the joint debt for the burial plots and the entire amount of the debt to the funeral home. In addition, taking into account that Donna has already paid Ray an equalizing payment of $61,673.54, we modify the district court's division of the Pacific Mutual TSA to award Donna $24,391.03 and to award Ray $21,154.97.[4] Ray shall remain solely responsible for his $750,000 malpractice judgment, as agreed by the parties.

---

[4]The modified property division is as follows:

| Marital Property | Donna | Ray |
|---|---|---|
| Homestead | $190,000 | |
| AIG account | $4872 | |
| 1998 Towncar | $9000 | |
| 1994 GrandAm (Matthew) | $2000 | |
| 1992 Buick Park Avenue | | $3000 |
| Truck (Ray's Business) | | $1500 |
| Bankers Trust Checking (W) | $84 | |
| Bankers Trust Savings (W) | $117 | |

## VI.    Postsecondary Education Subsidy

Under section 598.21(5A), a "court may order a postsecondary education subsidy if good cause is shown." Iowa Code § 598.21(5A). Ray argues the district court erred by not ordering a postsecondary education subsidy for Deborah.

An award of a postsecondary education subsidy first requires good cause. *Id.* In determining good cause, the court considers:

> the age of the child, the ability of the child relative to postsecondary education, the child's financial resources, whether the child is self-sustaining, and the financial condition of each parent.

| | | |
|---|---|---|
| Community Choice Account (W) | $371 | |
| Financial Plus Account (J) | | $44 |
| Wells Fargo Account (Deborah) | $40 | |
| Wells Fargo Checking (J) | | $10 |
| Wells Fargo Checking (W) | $306 | |
| Wells Fargo Savings (Matthew) | $5 | |
| Polk County Schools Credit Union | $1200 | |
| Furniture, Fixtures, Appliances, Personal Property | $7075 | $5000 |
| Pacific Mutual TSA | $24,391.03 | $21,154.97 |
| Pacific Mutual Life TSA | $1,138.50 | $1,138.50 |
| Mass Mutual | $969 | |
| Equalizing payment | ($61,673.53) | $61,673.53 |
| **Total** | **$179,895** | **$93,521** |
| **Less Debts** | **Donna's Share of Marital Debt** | **Ray's Share of Marital Debt** |
| Burial Plots | $9185 | |
| Capital One Card | $3743 | |
| Chase Card (Ray's Business) | | $2530 |
| Citi Card (Deborah) | $2871 | |
| Mortgage | $58,859 | |
| Lien on House | $10,369 | |
| Special Assessment | $398 | |
| MBNA (Ray's Business) | | $2174 |
| Raddatz Funeral Home | $3500 | |
| Rowat Cut Stone | | $3042 |
| 1998 Town Car | $5195 | |
| **Total Debts** | **$94,120** | **$7746** |
| **Total Equity** | **$85,775** | **$85,775** |

*Id.* § 598.21(5A)(*a*). Thus, if these factors fail to support good cause, no subsidy is necessary. For example, the financial resources of the child, along with other statutory factors, could justify a finding that a subsidy is not needed.

If good cause is shown for a subsidy, the court must then determine the amount. To do this, the cost of the college education is first determined, based on the educational costs of attending an in-state public institution. *Id.* § 598.21(5A)(*a*)(1). The amount the child can reasonably expect to contribute, including contributions in the form of student loans, is subtracted from the cost figure. *Id.* § 598.21(5A)(*a*)(2). The amount that remains is apportioned to the parents, with a ceiling for each parent equal to one-third of the cost of attending an in-state public institution. *Id.* § 598.21(5A)(*a*)(3).

The district court determined that no college subsidy could be ordered because Deborah was twenty-two years old. Although the age of the child is a relevant factor in considering good cause for a subsidy, a subsidy is defined under the statute to include children "between the ages of eighteen and twenty-two." *Id.* § 598.1(8). In this case, Deborah was in her senior year in college at the time of the trial in January 2004, and was scheduled to graduate in the near future. She would not turn twenty-three until September 2004. Thus, she satisfied the age requirements for a subsidy. *See In re Marriage of Neff*, 675 N.W.2d 573, 581 (Iowa 2004) (interpreting the statute to mean children under the age of twenty-three are eligible for a subsidy). Moreover, she had an outstanding tuition bill in the amount of $3109 at the time of trial. It is this amount that Ray claims should be the basis of a subsidy allocated between the parties.

The statutory subsidy provisions exist to help ensure that divorce between parents will not become a financial impediment to a child's college education. *See generally Johnson v. Louis*, 654 N.W.2d 886, 891 (Iowa 2002) ("The educational benefit is a quid pro quo for the loss of stability resulting from divorce."); *In re Marriage of Vrban*, 293 N.W.2d 198, 202 (Iowa 1980) ("[E]ven well-intentioned parents, when deprived of the custody of their children, sometimes react by refusing to support them as they would if the family unit had been preserved." (Citation omitted.)). The model used under the statute to accomplish this goal is based solely on the costs of a college education at an in-state public institution, and the statute then attempts to fairly allocate the costs among the child and the parents. *See* Iowa Code § 598.21(5A)(*a*)(1)-(3). Yet, this same cost component is also used to limit the amount of money parents can be ordered to contribute by the court. *Id.* § 598.21(5A)(*a*)(3). The subsidy, then, can fall short of providing a complete solution for all circumstances, and it is far from a perfect answer to the financial burden of attending college for most students of divorced parents.

This imperfection in the statute is especially evident for students of divorced parents who desire to attend a private in-state college or an out-of-state institution, where the costs will normally be significantly higher, or for students, like Deborah, who were already attending an out-of-state institution at the time of the divorce. The statutory subsidy may not fully assist these students because the court is not authorized to make a parent responsible to pay more than one third of the cost of an in-state public institution regardless of the cost of the institution attended. Thus, the subsidy approach recognizes that the law cannot always provide for a perfect solution to all problems, especially problems arising from family matters. At the same time, this law necessarily recognizes

that former spouses remain parents of the children following divorce, and are free to fill in the inevitable gaps properly left to them by the absence of obligations imposed by the law, motivated by matters totally detached from the divorce and intimately woven into the very fabric and meaning of parenting. *Cf. In re Marriage of Vrban*, 293 N.W.2d at 202 (recognizing that "most parents who remain married to each other support their children through college years" even though they have no legal obligation to do so). The law only imposes a minimum standard to guide conduct, and it does not foreclose a level of conduct in excess of the legal requirement.

In this case, the evidence is clear that Deborah received loans and federal work-study money to attend an out-of-state college in excess of the total costs of attending a public in-state college. Clearly, the subsidy statute does not *require* a parent to contribute to the college education costs when the child's available contribution exceeds the cost of attending an in-state public institution. Moreover, there is no evidence that Deborah would not have been able to contribute similar amounts to her own college education if she had attended an in-state college. Thus, because Deborah's contributions exceeded the cost of a public college education in Iowa, Ray and Donna cannot be made legally responsible under the statute to subsidize any additional costs of an out-of-state college education. Instead, the issue is a matter left to the parents and child.

### VII.   Attorney Fees

The district court ordered Ray to pay $7500 of Donna's trial attorney fees. We review this award for an abuse of discretion. *In re Marriage of Witten*, 672 N.W.2d at 773. "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *In re*

*Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). Because Ray was making more money than Donna at the time of trial and did not have to pay any attorney fees of his own, we cannot say the district court abused its discretion.

The court of appeals ordered Ray to pay $1000 of Donna's appellate attorney fees.

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."

*In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). We disagree with the court of appeals' decision to award Donna appellate attorney fees. Most of Ray's arguments on appeal were meritorious. Moreover, the errors by the district court resulted from its near-wholesale adoption of Donna's proposed findings of fact and conclusions of law. Thus, we will not order Ray to pay Donna's attorney fees for an appeal largely based on claims by Donna that were not only unsupported by principles of equity, but were clearly detached from the governing statutory provisions. Furthermore, the parties have the ability to pay their own attorney fees.

## VIII. Conclusion

This district court decree is affirmed, as modified in the following respects:

1. Ray is awarded $21,154.97 of Donna's Pacific Mutual TSA. The balance, $24,391.03, is awarded to Donna.

2. Donna shall be responsible for the full $9185 debt for the burial plots.

3. Donna shall be responsible for the full $3500 debt to Raddatz Funeral Home.

4. A QDRO shall be entered directing IPERS to pay benefits to Ray as a marital property settlement under the following formula: 50% of the gross monthly or lump-sum benefit payable at the date of distribution to Donna, multiplied by the "service factor." The numerator of the service factor is the number of quarters covered during the marriage period of November 25, 1978 through April 30, 2004, and the denominator is Donna's total quarters of service covered by IPERS and used in calculating Donna's benefit.

We remand the case for the district court to enter the QDRO consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND REMANDED.**