**IN THE COURT OF APPEALS OF IOWA**

No. 25-0016
Filed December 17, 2025

**IN RE THE MARRIAGE OF ASHTON AUDREY LYNN HARMELINK
AND BRADY ALAN HARMELINK**

**Upon the Petition of
ASHTON AUDREY LYNN HARMELINK,**
        Petitioner-Appellee,

**And Concerning
BRADY ALAN HARMELINK,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Dickinson County, Carl J. Petersen,

Judge.


        Respondent challenges provisions of the decree dissolving his marriage to

petitioner.  **AFFIRMED.**


        Jamie Hunter of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines,

for appellant.

        Alexandria Celli Smith, Michael L. Sandy, and Tyler J. Alger of Sandy Law

Firm, P.C., Spirit Lake, for appellee.


        Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

Sandy, J., takes no part.

**GREER, Judge.**

Brady Harmelink appeals the decree dissolving his marriage to Ashton Harmelink. He argues the district court erred by (1) failing to award joint custody, (2) sustaining Ashton's motion for sanctions against him for failing to respond to discovery, (3) failing to equitably divide property, and (4) ordering him to pay $5,000 in attorney fees to Ashton. Upon our review, we affirm.

## I. Background Facts and Proceedings.

Brady and Ashton Harmelink began residing together in 2017, had a child together in 2018, and were married in August 2019. They had two more children together in 2020 and in 2022. Brady bought the couple's first home with the financial assistance of Brady's parents prior to their marriage but while the couple was living together. In 2020, the couple bought a second home (marital home) and they used the equity realized from the sale of their first home to help purchase the marital home. In the spring of 2023, Brady and Ashton separated. Ashton continued to reside in the marital home with the children, and Brady resided with his parents.

Ashton filed for divorce that October. Soon after, the court held a hearing and issued a temporary order. The district court found Brady "ha[d] been absent in caregiving since the parties' separation in April 2023." And Ashton

> provided all the consistent nurturing of the children. [Brady] . . . served as a provider but ha[d] neglected his parenting role. [Brady] clearly ha[d] an alcohol problem that affect[ed] his ability to be [a] father. During the few visits Brady . . . had the past seven months, [his] parents have provided direct care of the children.

The court awarded temporary joint legal custody to both parents and temporary physical care to Ashton.  Brady received visitation every other weekend as well as a midweek visitation every Wednesday until 7:00 p.m.  Brady was ordered to "refrain from the use of alcohol and all illegal substances during the period of visitation and the twelve (12) hours preceding said visitation."  Additionally, the court order required Brady to pay $1,038 per month for child support.  While the action was pending Brady had to pay the mortgage and utilities for the marital home and Ashton was required to pay the children's daycare costs.

In February 2024, Ashton filed an application for contempt alleging that Brady had failed to pay any child support for months, then-totaling $3,114.  Brady was found in contempt.  The court gave him an opportunity to purge the contempt by paying the amount he was delinquent in child support by April 26.  Brady did not comply, and Ashton applied for an issuance of mittimus.  Prior to the mittimus hearing, Brady paid a portion of the child support arrearage.  Then, Ashton moved to compel Brady to answer the delinquent discovery she had served on him.  The district court sustained the motion and ordered Brady to respond to the discovery by June 7.

In July 2024, the trial took place.  Ashton testified that she was twenty-seven years old, was self-employed as a professional cleaner and organizer, and worked with an online marketing company with an annual income of $21,600.  Brady was thirty-three at the time of trial and employed as a car dealer at the dealership he owns in partnership with his father.  Adding other part-time work he does, he claimed to have an annual income of $18,864, although at a temporary hearing he claimed he earned $24,000 per year.  Brady testified that he was not on salary but

received 50% of the proceeds from car sales made at the car dealership. He testified to an agreement with his father that he can borrow money when necessary. He alleged that he had no ownership interest in the assets of the auto business and requested that the company's funds not count towards his assets. Brady's father testified that "none of that money is Brady's unless he has an outstanding commission." The district court gave Brady's father's testimony "little weight" and found his statements to be "self-serving."

At trial, Ashton testified that she tracked Brady's absences from the home beginning in March 2023, and he was gone for days or weeks at a time. She claimed that Brady struggled with alcohol abuse and the use of cocaine and prescription pills. She alleged that he planned to go to treatment but never followed through on that plan. Brady claimed that he sought treatment from a different provider and went to three sessions.

To highlight his alcohol abuse, Ashton testified that the children's daycare no longer allows Brady to pick up the children because one day he arrived intoxicated. Brady denied this ever happened. The daycare worker testified that it did occur, and that Brady now picks up the children with his mother.

After the trial, the district court awarded joint legal custody but awarded physical care to Ashton with visitation to Brady. Brady is to pay $1,038 per month in child support. The court sustained Ashton's motion for sanctions against Brady for failure to answer discovery requests. In dividing the property, the district court awarded the marital home to Ashton. The district court found that an equal division of property would be appropriate and required Ashton to pay a cash settlement to Brady of $22,700 to achieve that end. This settlement was to be paid in

installments over two years with interest. The district court awarded Ashton $5,000 in attorney fees. Brady appeals.

## II. Standard of Review.

"We review dissolution cases de novo." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). We are not bound by the factual findings of the district court, but "we give them weight, especially as to credibility determinations." *Thorpe v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020).

We review a district court's order imposing discovery sanctions for abuse of discretion. *In re Marriage of Williams*, 595 N.W.2d 126, 129 (Iowa 1999). And "[w]e review the district court's award of attorney fees for an abuse of discretion." *Sullins*, 715 N.W.2d at 247.

## III. Analysis.

On appeal Brady argues: (1) the district court erred in not awarding joint physical care to both parents, (2) the court erred in sustaining Ashton's motion for sanctions, (3) the court failed to equitably divide the marital property, and (4) the district court abused its discretion by awarding Ashton attorney fees. We address each of these issues in turn.

**A. Physical Care.** Brady argues the court should have awarded joint physical care of the children rather than awarding Ashton physical care. When the court awards joint legal custody to the parents, the court may award joint physical care or physical care to one parent. Iowa Code § 598.41(5)(a) (2023); *In re Marriage of Hansen*, 733 N.W.2d 683, 695–96 (Iowa 2007). We base physical care decisions on the best interests of the children and consider a multitude of factors, including the factors in Iowa Code section 598.41(3) and those outlined in

*In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).[1]  *Hansen*, 733

N.W.2d at 696.  If "both parents are suitable caregivers" the court will consider four

main factors to determine "whether joint physical care will be in the children's best

interests": "(1) stability and continuity of caregiving; (2) the ability of [the parents]

to communicate and show mutual respect; (3) the degree of conflict between the

---

[1] The factors listed in Iowa Code section 598.41(3) are:
a. Whether each parent would be a suitable custodian for the child.
b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
c. Whether the parents can communicate with each other regarding the child's needs.
d. Whether both parents have actively cared for the child before and since the separation.
e. Whether each parent can support the other parent's relationship with the child.
f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
g. Whether one or both of the parents agree or are opposed to joint custody.
h. The geographic proximity of the parents.
i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
j. Whether a history of domestic abuse, as defined in section 236.2, exists.  In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3, the issuance of a protective order against the parent or the issuance of a court order or consent agreement pursuant to section 236.5, the issuance of an emergency order pursuant to section 236.6, the holding of a parent in contempt pursuant to section 664A.7, the response of a peace officer to the scene of alleged domestic abuse or the arrest of a parent following response to a report of alleged domestic abuse, or a conviction for domestic abuse assault pursuant to section 708.2A.
k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry as a sex offender under chapter 692A.

parents; and (4) the degree to which parents are in general agreement about their approach to daily matters." *In re Marriage of Geary*, No. 10-1964, 2011 WL 2112479, at *2 (Iowa Ct. App. May 25, 2011) (citing *Hansen*, 733 N.W.2d at 696–99). As always, the children's best interests are a primary concern. *See* Iowa Code § 598.41(5)(a); Iowa R. App. P. 6.904(3)(n). And upon our review we examine "the unique facts" of each case. *Hansen*, 733 N.W.2d at 695. If we determine that joint physical care is not in the children's best interest we consider "which caregiver should be awarded physical care" and "the factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* at 700.

We begin with determining whether joint physical care is in the children's best interests. Considering the first factor of stability and continuity, Ashton has managed the children's daily needs both before and since the parties' separation in spring 2023. The district court found that Brady could not serve as a physical care provider due to "[h]is historical lack of consistently parenting and his actions during the pendency of this action." We agree that Brady has not demonstrated stability in parenting. The record shows that when Ashton offered Brady visitation beyond what was outlined in the temporary decree, he declined. The goal of this first factor "is to avoid disruption to the children's lives, not to give credit to the parents for their prior parenting time." *In re Marriage of Harper*, No. 22-0041, 2023 WL 4105536, at *4 (Iowa Ct. App. Jan. 25, 2023). But we consider that "where one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases." *Hansen*, 733 N.W.2d at 698. Because of Ashton's consistency in providing

majority of the care for the children, with little assistance from Brady, this factor weighs against joint physical care.

Turning to the second and third factors, we look to the parties' ability to communicate and the degree of conflict between them. Joint physical care is not feasible when the parties have a history of hostile and petty conduct. *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). Here, the district court found that "[t]he parties do not appear capable of co-parenting. The parties lack the ability to effectively and routinely communicate. The conflict in the marriage was significant. The lack of trust in the marriage and during separation is significant. The parties do not respect each other." We agree with the district court's findings, and the second and third factors weigh against joint physical care.

Addressing the final factor of the parents' approach to general matters, both parents testified about concerns they had with the other parent's interactions with the children. Brady testified that he had heard from neighbors that Ashton was not adequately supervising the children when they were playing by the street. Ashton testified that she was concerned with Brady's alcohol consumption and potential substance use. Ashton claimed that one night, when the children were in Brady's care at his parents' home, Brady left in the middle of the night and was gone when the children woke up in the morning. And that after this event, Ashton and Brady's parents agreed that the children would not be left in his care unless "one of the three of [them] were present as well." Parents who disagree "on child rearing issues" have a higher "likelihood that ongoing bitterness will create a situation in which children are at risk of becoming pawns in continued post-dissolution marital strife." *Hansen*, 733 N.W.2d at 699. Here, the fourth factor also weighs against

joint physical care. In reviewing all of the factors, we find that joint physical care is not in the children's best interests.

Because we determine that joint physical care is not in the children's best interests, we turn now to determine which parent should be awarded physical care using the factors in Iowa Code section 598.41(3), and in *Winter*. *See Hansen*, 733 N.W.2d at 696. Again, "the factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* at 700. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

In considering the parents' caregiving to the children the district court had similar findings to those it made after the temporary matters hearing that:

> Ashton has been the primary physical care provider. Brady has never really served in this role primary care of the minor boys. His parenting has always been in the form of a secondary source of care. When the parties' relationship began to break down, Brady withdrew himself further from the care of the minor boys, leaving one hundred percent of the care to Ashton.

Upon our de novo review of the record, we agree with the district court's findings. The factors of continuity, stability, and approximation favor Ashton as she has primarily handled the children's physical care. *See id.* at 696–97 (holding that "[s]tability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care" and the approximation factor focuses on the "historic patterns of caregiving"). Because Ashton has been the children's caregiver it would be in their best interests for her to continue to do so. *See id.*

We find that the district court's award of physical care to Ashton is in the best interests of the children, so we affirm.[2]

**B. Sanctions.** We take up the issue of sanctions next because it impacts our consideration of the record in this case. In the decree, the district court sustained a pending motion for sanctions and "disregard[ed] any positive evidence presented [by Brady] concerning the issues of property." Brady argues the court erred because there was "a lack of substantial evidence to support" the district court's decision thus, it was too severe. Specifically, he points to the district court's misunderstanding that he failed to produce discovery responses even though he contends he responded to discovery pursuant to an agreement *before* Ashton filed her sanctions motion. Thus, according to Brady, the court should not have disregarded testimony from Brady and his father on the property issues or failed to consider two of his financial exhibits that related to a promissory note to his father and advancements on that note. He claims that the evidence not considered by the district court was "critical to the equitable division of property." Upon our review, we note that "[t]he district court has wide discretion" when deciding whether to impose sanctions for discovery violations. *In re Marriage of Butterfield*, 500 N.W.2d 95, 98 (Iowa Ct. App. 1993).

Here, Brady failed to timely respond to discovery requests. Ashton served discovery requests in December 2023 and January 2024. In April, Ashton moved to compel under Iowa Civil Procedure Rules 1.501(3) and 1.157(5). The district

---

[2] Brady argued that he "should be awarded joint physical care of the minor children, with child support calculated accordingly." We do not disturb the physical care award, thus we do not need to recalculate child support obligations. *See Geary*, 2011 WL 2112479, at *3.

court ordered Brady to comply with discovery by June 7. The order "cautioned that failure to comply with this order could result in sanctions pursuant to I.R.C.P 1.517(2)(b) including the Court not allowing [Brady] to present evidence at trial."

On June 14, Ashton moved for sanctions acknowledging that Brady did disclose some information but failed to provide other information, such as any documentation that showed his pre-marital claim to specific property. The court granted Brady's motion to continue and extended the deadline for discovery until June 24. Brady failed to provide discovery by the new deadline, and Ashton filed an amended motion for sanctions. In July, the court denied Brady's June 28 motion to enlarge discovery deadlines and continue trial.

Brady claims that his father's testimony was not a "surprise" to Ashton because she had him on her witness list. But Ashton counters that the scope of his testimony was "surprising" because she "did not have the information to which he was intended to lay foundation for upon Brady's direct examination until two days prior to trial." The district court expressed frustration over what was disclosed during the trial and the difficulty it presented in obtaining a clear picture of the assets of the marriage. For example, the district court found that Brady's father's "testimony about premarital property, gifts, the finances of [the car dealership] and the like were clearl[y] not disclosed in discovery as requested." And in its order to address Brady's reconsideration motion, the district court added to the decree these findings:

> [Ashton's] second resistance sets forth a time frame of the discovery disputes of this case and makes clear (consistent with observations of the Court at trial) that [Brady] presented new evidence at trial that was not disclosed during discovery. The Court warned [Brady] and his newly retained counsel that failure to provide the requested

discovery would be sanctioned with the Court not receiving such evidence in its pretrial order dated June 17, 2024. (The Court did allow this evidence for appeal purposes only).

Upon reviewing the record, we find no abuse of discretion by the district court. Civil trials should "not be conducted by ambush" and the last-minute production of documents and surprise testimony were prejudicial to Ashton. *See State ex rel. Hager v. Carriers Ins. Co.*, 440 N.W.2d 386, 389 (Iowa 1989). We affirm on this issue because the district court exercised appropriate discretion disregarding evidence that was not disclosed through discovery.

**C. Property Division.** Brady alleges that the district court's division of property is inequitable. Specifically, he contends that the district court: (1) failed to consider a portion of equity in the marital home as a gift he received from his father, (2) erred in attributing any of the car dealership funds to his assets, (3) failed to account for his credit card debts, and (4) erred by not considering Brady's debts to his father. We will address the challenges to the property distribution in turn.

1. *Marital home.* At the start, Brady contends that he should have been awarded the marital home because he and Ashton agreed to that plan in the pretrial stipulation and during the trial. Brady argues that Iowa Code section 598.21(5)(k) requires the district court to consider the parties' agreement regarding this property distribution. In the parties' pretrial stipulation, they agreed that the marital home was jointly owned and that the husband should be the recipient. Section 598.21(5)(K) provides that the district court shall consider "[a]ny written agreement made by the parties concerning property distribution." The court has the authority to reject a stipulation if it is unfair or contrary to law. *In re Marriage*

*of McCreedy*, No. 11-1835, 2012 WL 3196033, at *3 (Iowa Ct. App. Aug. 8, 2012) ("The court is not bound by the parties' agreement as to how their property should be distributed."). Here, the district court stated, "If there was an agreement between the parties concerning a particular item of property or a liability, the court has incorporated that agreement in the table." And that in distributing the property it "weigh[ed] all of the relevant factors set forth in Iowa Code Section 598.21(5)."

Brady moved to have the court reconsider the award of the marital home to Ashton. In response, Ashton did not object to the award to her, indicating that the district court "properly used its discretion" in awarding her the marital home and "maintains the power to equitably distribute the parties' assets and debts." We do not have the court's reasoning as to why it ignored the pretrial stipulation because the district court did not specifically address Brady's contention in its reconsideration order. But, on this record, the district court could have considered how difficult it was for Ashton to collect child support from Brady and thus wanted to avoid the concern over the collection of an equalization payment he would have to make. Or, the court could have considered that it was the family home and there were three young children who would continue to live there. As Brady indicated in his proposed visitation statement in the pretrial stipulation, the parents should rotate time in the family home during visitations. Though the district court did not adhere to the parties' stipulation of who should receive the marital home, we find the distribution of assets equitable. Thus, although Brady requested he be awarded the home, the division of the property, after payment of the $22,700 cash settlement, results in an equitable division of property.

With the award of the home resolved, we next address Brady's contention that "close to $65,000" worth of equity in the marital home should be considered a gift from his father and thus should not have been divided, but credited to him.[3] Ashton acknowledged that Brady's father helped them purchase the home, but testified that her father also helped the household with gifts of personal property. In the decree, the district court stated that it would not set aside any gifts made to Ashton or Brady.

To arrive at the division of assets, the district court considered evidence presented by the parties and found that $245,000 would be fair market value for the home and, after deducting the amount due on the mortgage, the net value was $105,588. We agree with that analysis. *See Hansen*, 733 N.W.2d at 703 (holding that we do not disturb the district court's valuation of assets when the valuation is within the range provided by the permissible evidence). The district court then allocated the $105,588 to Ashton's side of the ledger but did not give Brady credit for the claimed $65,000 his father "gifted" him to apply towards the home purchase. As Brady's father testified, he provided funds that were applied to the purchase of the first house Brady purchased where Brady and Ashton lived before they were married. It is where they lived when they had their first child. When that first home was sold, Brady claims the equity, including the gifted amount, was rolled over into the marital home purchase.

---

[3] Brady claims that "[t]he decree does not require Ashton to refinance the home or to remove Brady from the mortgage." We review the decree and find that Ashton was required to refinance the home. The decree states that "Ashton shall assume the mortgage payments and refinance the home in her own name within nine months of this Decree."

First, we determine which property is subject to division, and second, we divide the property in an equitable manner according to the listed factors in Iowa Code section 598.21. *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007). "Although an equal division is not required, it is generally recognized that equality is often most equitable." *Id.* (citation omitted).

Property not subject to division is inherited and gifted property, "except upon a finding that refusal to divide the property is inequitable." *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013) (quoting Iowa Code § 598.21(6)); *see In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989) ("To avoid injustice property inherited by or given to one party may be divided."). Controlling factors to determine whether property should be considered divisible include the donor's intent "and the circumstances surrounding the inheritance or gift." *In re Marriage of Liebich*, 547 N.W.2d 844, 850 (Iowa Ct. App. 1996).

With no evidence to the contrary presented, the district court found that "[t]he gifts were not designated to either party but given to the benefit of . . . both parties and most directly for the benefit of the children." Upon review of the record, we agree with that assessment. Brady testified that money received from his father to purchase their first home was a gift, though at trial he could not recall the amount of the gift. The first house had been Brady's brother's home, but Brady's father testified that he asked his other son to "move home so Ashton and Brady can possibly buy your house." More specifically, Brady's father testified that he helped purchase the home so that Ashton and Brady could move out of Brady's parent's house due to Ashton's pregnancy and that the amount was "somewhere in the

$65,000." Yet, no official documents presented at trial supported that amount. He testified,

> We've raised our kids. We're not going to have babies in this house. So I talked to [Brady's brother] who had a house . . . , and I said, . . . will you move home and so Ashton and Brady can possibly buy your house. . . . And so we sent Ashton and Brady over there, and Ashton approved that she could live there with no problems.

Brady's father also testified that the house should be neither Brady nor Ashton's house but "that [it] should be the kids' house." From his testimony, it appears that the gift was meant to be a benefit for both parties and the children. Considering the circumstances and what we can glean from Brady's father's intent in the testimony, we find the district court reached the same conclusion. *See McDermott*, 827 N.W.2d at 680 (finding the evidence did not show that the donations of property were to benefit the husband alone, but were intended to inure to the family, thus would not constitute gifts in the division of property).

Further, Brady asserts that, if not considered a gift, the district court disregarded the pre-marital asset value involved with the purchase of the first home. As he contends, the district court improperly considered the length of the marriage and the length of the parties' cohabitation to disregard his premarital contribution. In the decree the district court stated "that based on the length of the marriage and the length of cohabitation the Court shall not set aside any premarital property as this would be unreasonable and unfair." Brady argues that this was a short marriage and it would be unfair for Ashton to benefit from assets he brought into the marriage, albeit assets provided by his father. "We have stated that the claim of a party to the premarital property owned by the other spouse in a short-term marriage is minimal at best." *In re Marriage of Hansen*, 886 N.W.2d 868, 872

(Iowa Ct. App. 2016) (cleaned up); *see also*, *e.g.*, *In re Marriage of Peiffer*, No. 12-1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (considering a seven-year marriage to be "of relatively short duration"). We consider the marriage here—of four years—to be short in duration and this factor weighs against the division of the property. But because we found that the funds given were meant for the benefit of both parties the short duration of the marriage does not impact the asset division. We find the district court's treatment of the claimed contribution from Brady's father was not inequitable.

2. *Car dealership funds*. Brady claims the district court erred in attributing any of the car dealership's funds to him. Brady described splitting the proceeds from the automobile sales with his father but then testified he does not own the money in the dealership's operating account. The district court noted that determining the value of Brady's interest in the car dealership was "[t]he most difficult decision" it had to make but it was clear from the tax filings[4] and testimony that he was a 50% owner in the business. The decision was made all the more difficult because the district court sanctioned the testimony of Brady's father regarding the car dealership's finances due to Brady's failure to timely submit discovery. The district court allotted $75,000 as Brady's half ownership interest in the dealership, putting the dealership account balance at $150,000. Brady asserts that credible evidence does not support that balance. But the car dealership bank records reflected a range of balances topping at $202,581.53 in September 2023 just before Ashton petitioned for dissolution of marriage. Upon reviewing the

---

[4] The K-1 tax documents list Brady as a 50% owner of the dealership.

record and the dealership's bank statements we choose not to disturb the district court's valuation. *See Hansen*, 733 N.W.2d at 703. We find the district court properly considered the dealership's funds when calculating Brady's assets.

3. *Credit card debts*. Brady contends that the district court's failure to consider his credit card debt resulted in an inequitable distribution of property. In his appellate brief, he claims it was "undisputed" that he had $11,980[5] in credit card debt that should have been considered in the division. But, the problem is that the district court found the current credit card debt was an "unknown" amount, noting that "Brady failed to disclose his assets and liabilities." And that he "failed to provide [multiple online banking] accounts as requested, . . . and any credit card documentation, although he report[ed] substantial credit card debt."

In July 2024, the parties filed a pre-trial stipulation, and both agreed that Brady's credit card debt was an "unknown" amount. On the same day, Brady filed his affidavit of financial status that claimed the couple jointly had $15,000 in credit card debt. At trial Ashton produced evidence that Brady had nearly $12,000 worth of credit card debt in October 2023. Ashton testified that she last saw his credit card debt in the summer of 2023 and it was "pretty high." But she testified that at the time of trial, she was unaware of any marital credit card debt through Brady's credit cards. Brady was questioned about his use of his credit cards and that he made large purchases at various bars. Brady agreed that he never provided Ashton or her counsel with an updated balance of their credit cards.

---

[5] Tellingly, this number is the total of two credit card balances from October 2023, that Ashton produced at the trial.

On appeal, Brady argues that "[w]hile the entirety of Brady's debt may have been unknown to the court, it was undisputed that, at the time of filing [the petition for dissolution of marriage], he owed nearly $12,000." Irrespective of the actual balance, at trial Brady did not offer proof that the credit card debts stemmed back to when the couple was together, if the charges related to joint purchases or even what his debt was in July 2024. When calculating parties' debts, we do not have to consider debt that "accumulated after the parties' separation." *See id.* Thus, we will not disturb the district court's valuation of Brady's debt. *See Sullins*, 715 N.W.2d at 251 (refusing to disturb the district court's finding that a husband's claim of debt was unsupported by the evidence in part relying on the district court's findings of witness credibility).

4. *Brady's debt to his father*. Brady claims the district court improperly excluded debts owed by Brady to his father when calculating his financial status. The list of advancements made against a promissory note signed with Brady's father was presented at trial. The list consisted of handwritten notes describing the payments for child support and $15,000 for attorney's fees, totaling over $37,000. As we noted above, the district court disregarded this evidence because Brady failed to produce timely discovery; so there was no opportunity for Ashton to contest or explore the claim given the minimal documentation. Brady's father's testimony about this was given little weight by the district court as it considered his statements to be self-serving. Nor did the district court find Brady to be a credible witness regarding his financial circumstances, income, and spending. *See id.* ("Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses."

(citation omitted)). We are not bound by these findings, but we can consider them. *Thorpe*, 949 N.W.2d at 5.

In declining to consider the debt obligation, the district court refused to "reward Brady by reducing his assets by sums of past due child support." And the court further noted that "attorney fees are not considered in property distribution." In *Hansen*, the court considered the distribution of marital assets and debts and the husband was not given credit for outstanding debt for his attorney's fees from the dissolution proceeding. 733 N.W.2d at 703 (noting that giving the husband such credit would have been "illogical" because the wife "was not given reciprocal credit for her litigation expenses"). We agree with the district court's finding that Brady's advancements on the promissory note with his father should not have been considered in property distribution.

After careful consideration, we determine that the property division was equitable under these circumstances, and we affirm the district court's distribution. Any equity in the marital home from Brady's father was correctly divided along with all other property. The tax records and other evidence support that Brady was a 50% owner of Harmelink Auto and half of the business's value should have been considered in the property division. The record does not show the current value of Brady's credit card debts which Brady labeled as "unknown" in the parties' pre-trial stipulation and so the court correctly did not consider the balances in the division of property. Brady's purported debts to his father were not established through credible evidence in the record and were in part for his attorney fees and child support. We affirm the district court's distribution of property.

**D. Attorney Fees.** Brady argues that the district court erred in awarding Ashton $5,000 in attorney fees. Awards of attorney fees must be for fair and reasonable amounts and based on the parties' respective abilities to pay. *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003). The district court has "considerable discretion in awarding attorney fees." *Id.* (citation omitted). We will not disturb an award of attorney fees absent an abuse of discretion. *In re Marriage of Francis*, 442 N.W.2d 59, 67 (Iowa 1989). Here, the district court found that, "[n]either party has significant cash assets to pay attorney fees. Ashton, however, should recover for the extraordinary attorney fees associated with filing contempt and discovery motions." The district court considered her fees associated with the contempt motions to be "outside the normal course of matrimonial litigation."

We find that the district court exercised appropriate discretion in awarding attorney fees, and we affirm.

**IV. Conclusion.**

We affirm the dissolution decree because the district court's award of physical care to Ashton is in the children's best interests. Likewise, we find the overall division of property to be equitable. And the district court exercised appropriate discretion in both sustaining Ashton's motion for sanctions and awarding her attorney fees.

**AFFIRMED.**