# THE COURT OF APPEALS OF IOWA

No. 17-2055
Filed September 12, 2018

IN RE THE MARRIAGE OF LEE T. BAILEY
AND AMIE JO BAILEY

Upon the Petition of
LEE T. BAILEY,
    Petitioner-Appellee,

And Concerning
AMIE JO BAILEY, n/k/a AMIE JO RUSSELL
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Audubon County, Susan L. Christiansen, Judge.


Amie Jo Russell (formerly Bailey) appeals from the district court's modification of the decree dissolving her marriage to Lee Bailey. **AFFIRMED AS MODIFIED AND REMANDED.**


Christine Sand of Wild, Baxter & Sand, PC, Guthrie Center, for appellant.

Dennis R. Mathahs of Mathahs Law Office, Marengo, for appellee.


Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Amie Jo Russell (formerly Bailey) appeals from the district court's orders modifying the decree dissolving her marriage to Lee Bailey, arguing the district court erred in several respects. First, she contends the court improperly modified the physical-care placement of the parties' minor children from her to Lee, asserting Lee failed to establish that there was a substantial change in circumstances and that he was the superior caregiver to warrant modification. Second, she maintains the court improperly imputed only minimum-wage income to Lee for purposes of calculating her child-support obligation, given the court's finding that Lee had voluntarily reduced his income. Third, Amie asserts the court improperly ordered that her child support obligation be effective retroactively. Fourth and finally, Amie argues the court improperly failed to hold Lee in contempt for his failure to pay her child support. Upon our review, we affirm as modified and remand.

### I. Background Facts and Proceedings.

Amie and Lee married in 2001 and divorced in 2008. They have three children, two of which are minors, though one will turn eighteen this year. The decree placed the children in both parents' joint legal custody, with Amie having "permanent primary physical care" of the children and with Lee having "reasonable and liberal" visitation. Lee's 2008 affidavit of financial status reported he was self-employed grossing $800 per week (no deductions are shown),[1] and he was ordered to pay monthly child support of $690.

---

[1] Thus, Lee's income was $41,600 annually ($800 x 52). The decree indicates Lee's net monthly income was $3466.67 ($41,600 per year).

Less than a year after the parties divorced, Amie moved from Iowa with their children. Lee subsequently filed a petition for modification of the decree, requesting he be granted physical care of the children. He also sought that Amie be cited for contempt for not complying with the visitation provisions of the parties' decree. The court in December 2009 found Amie in contempt but permitted Amie to purge the contempt by complying with the court's order granting Lee certain scheduled visits with the children. Amie complied and the contempt was dismissed.

A trial on Lee's 2009 modification petition was held in 2010. Thereafter, the court entered its decree of modification, making modifications to the parties' decree but leaving the children in Amie's physical care. Although the court found Amie had lived a "nomadic lifestyle" after moving from Iowa, the court found Amie's situation had stabilized after she moved to North Carolina. The court explained:

> Amie claims to see the past error of her ways. Visitation has gone much better since the contempt was purged.
>     Lee wishes to continue to rehash the denial of his telephone visits with the children. His ill will is understandable but offers little assistance to the children's best interest. Lee has likewise moved several times since the decree but all within the State of Iowa. . . .
>     Both Amie and Lee are strong-willed and can only view a situation from their respective vantage or angle. Little or no communication exists between the parties. In dealing with the children, Lee's strength appears to be outdoor activities and horses. Amie's strength appears to be in providing the children academic and religious programs. Both need to work on their respective skills of compromise and communication with each other. The children's wellbeing demands same.
>     . . . .
>     This court specifically cautions [Amie] of the following: (a) not to return to her nomadic lifestyle; (b) to encourage Lee's visitation with the children; and (c) to schedule medical appointments and religious activities not to interfere with Lee's custodial periods. The court specifically cautions Lee not to undercut the children's needs

by promoting his own desires. The court cautions both parties to improve their communication with each other.

Thereafter, Lee struggled to pay Amie child support as decreed. It appears he started getting behind in his payments by October 2011 and was approximately $5000 in arrears by September 2012. In March 2013, Lee was in $11,250 in arrears. Amie and Lee entered into a joint stipulation so that Lee could get caught up on the amount owed, and the district court approved the stipulation. Lee agreed he was "in contempt of court for willfully violating his court ordered support obligation to the minor children of this matter." A year later, Lee had complied with the terms of the approved stipulation and purged himself of the contempt finding.

At the end of 2013, Lee sought to reduce his child support obligation by requesting a review and adjustment from the Child Support Recovery Unit (CSRU). The financial-statement form Lee signed in January 2014 stated Lee was employed full-time as a truck driver. Though the form had a place to fill in "[t]he amount of [his] last paycheck," no information was provided.[2] The CSRU's review determined Lee's gross monthly income at that time was $3490.68, and, after adjustments, his net income was $2703.63 per month.[3] After determining Amie's income, the CSRU calculated Lee's support obligation had actually increased under the child support guidelines—from $690 to $943 per month—based upon his and Amie's incomes. Lee then asked to withdraw his request to review and adjust his child support. Amie requested the CSRU to continue the review.

---

[2] The form also directed that he attach his last three paystubs. However, none appear in our electronic record. It is unknown if Lee did not provide them to the CSRU or they were simply not included in this binder.

[3] Based upon the gross monthly figure, Lee's annual income at that time was $41,888.16 ($3490.68 x 12), with a net annual income of $32,443.56 ($2703.63 x 12).

Ultimately, the matter was set for hearing. By the time of the July 2014 hearing, the CSRU revised its calculations increasing Lee's recommended child support to $1038 per month. The court ordered Lee's obligation be increased to $1038 per month for the three minor children, then reduced to $897 after the eldest reached majority, then $637 after the middle child reached majority.

Things came to a head around Christmas 2015. Lee was to have Christmas visitation with the children, and he bought airline tickets to fly them to Iowa. Amie did not send the children, and Lee ultimately filed an application to show cause. Not buying Amie's explanation, the court found Amie in contempt. The court allowed Amie to purge the contempt by complying with its order, which included Amie paying for the cost of the tickets plus new tickets for the children to visit Lee. Amie complied, and the court purged her contempt in June 2016.

In October 2016, Lee again sought to reduce his child support obligation through the CSRU. Lee's financial-statement form signed in January 2017 stated he was self-employed, and on the blank line to indicate "Job Title or Occupation," Lee wrote, "ATV Repair—just setting up no income." Based upon Lee having no income, the CSRU determined under the child-support guidelines, Lee's support obligation was to be $50 per month.

In March 2017, Amie challenged the CSRU's contemplated reduction of child support, based upon Lee's voluntary reduction of his income. Lee then filed a petition for modification of the decree, requesting the two minor children be placed in his care and Amie pay him child support. He subsequently filed an affidavit of financial status stating his income was "$0.00 per month." In July 2017,

Amie filed an application for show cause stating Lee had failed to meet his child support obligations and was $4500 in arrears.

All of the matters pending between the parties were tried to the court on August 16, 2017. With the consent of the parties, the judge visited with the parties' two minor children outside of the presence of the parties and their counsel.[4] At the end of the trial, the court issued an initial ruling from the bench.

> Regarding the child support issue, I find there's been a voluntary reduction in income. Pretty substantial. I think that I'm not going to touch the child support as far as the numbers that have been submitted. . . . I don't find contempt. Even by Amie's own testimony, she did not find that it was on purpose, that [Lee was] trying to pay what you could while building up a new business. I do find that the reduction in income was voluntary, a pretty significant voluntary reduction. For purposes of the child support calculation I'm going to direct the [CSRU] attorney to recalculate child support assessing the minimum wage full-time status for you. I'm also going to not make that retroactive. It will be effective upon the filing of the decree. So the old amount remains in place until a recalculation.

With regard to the contempt issue concerning Lee's child support arrearage, the court ruled,

> What I'll do is continue the rule to show cause to give him an opportunity to get current. I don't find you have willfully disobeyed; but you are in violation of court order. You do have an arrearage. Based on my finding, you voluntarily reduced your income and not real sympathetic to that argument. But I do not find that it was willful; but you are not current. But you've tried hard to get current as of the 1st of the year. So, instead of purge, I will continue the rule to show cause, and you are to be current by that next hearing date.

The court stated it was going to order that both children be placed in Lee's custody, finding there had been a substantial change in circumstances not contemplated at the time of the 2010 modification decree and that Lee had shown he has a superior

---

[4] The parties agreed the judge's summer law clerk, a second year law student, could be present during the judge's visit with the children.

parenting ability. The court explained its ruling to the parties' two children on the record:

> Guys, I asked you to come back in because I wanted you to hear it from me in the presence of Mom and Dad why I'm doing what I'm doing. . . . This was a really super, super hard case for me. Sometimes I have parents who've done really horrible things. . . . That's not your mom and dad's case. Nobody presented any evidence that Dad is a horrible dad. Nobody presented any evidence that Mom is a horrible mom. I think when you are in the care of your mom your mom makes good decisions. She provides for you medically. She provides for you academically. You're both little rock stars in the school environment. That's cool. Likewise, when you're with Dad. Are there lots [of people] allowed to live at Dad's house? Yeah. But I made a finding, which means I'm ruling, that's not a bad thing. Nothing was presented to the court those people are horrible people or no child should be with them. Is it crazy and busy and different than being with just Mom? Sure. But sometimes that's how family is.
>
> So what are my concerns? My concerns are—whether you guys are aware of the actual number or not—Mom and Dad had lots of time in court. And when people get divorced, it's the idea of the court that you enter an order once and then we're done until the kids are grown up. When problems arise we have to come back to court. Sometimes it's not a big deal. . . . Other times it's a big deal, like this time. Not too long, about a year ago, I was the judge. You didn't come back or, at least, I didn't see you a year ago. And it had to do with something really serious. Your mom is a good mom to you guys; but she did not follow another judge's order, which is the same as being my order. A different judge said, "You need to let Dad be with the kids and when he's supposed to be with the kids, you don't interfere with that." Evidence was presented to the court that she did do that. Even though maybe you guys didn't sense it—maybe you did—your dad had a right on paper to have a relationship with you guys, and it was thwarted, kind of thrown off the track. So I made a finding a year ago that, Mom, that was wrong. That was wrong for you to flex muscle and not let Dad see the boys. You wasted a lot of money on plane tickets. You guys know all about that. That's not why we're here today. At that time, on that day, I could have changed custody right that day. It's one of the things you can do in contempt. I could have, and I was this close to doing it. It really bothered this court that Mom didn't seem to take court orders seriously. They were just suggestions instead of orders. The damage that's been done because of those years of her getting in the middle of your relationship with your dad, it's no wonder that—I know, in particular, [the youngest child] might be a little bit less effected. You're younger.

And [the older minor child] is a little more affected. The older you get—if you lived with your dad and these things were happening, you would want to be with your mom too. And we call that—the legal term for that, it's called "parental alienation of affection," and it's kind of a big word; but what that means is one parent interferes with a child's feelings of love and affection towards the other parent. So even though Mom didn't do anything to physically hurt you guys, the court considers it to be a form of emotional involvement when you don't let the other parent be a parent. But what's happened since 2010 and the court changed custody—custody was always with Mom and Dad had visits—the court changed custody to him to give Dad physical custody in the summer because of these problems and Mom was told to knock it off. Then we had that contempt just last summer. And, since then, what's happened? Yet, another move. One of the biggest things the prior judge mentioned in '10, he referred to your mom's life as "nomadic lifestyle," that means moving around a lot. Whatever the reasons were, you had another move happen. And this court is concerned that you guys need stability. And I told them a little bit. I summarized what you guys said. I never once asked you where you want to live and never once did either of you tell me where you wanted to live. The message I got loud and clear from you boys is you moved around a lot. You had a lot of states and a lot of school districts. Friends and stability are something that you both struggle with as far as continuity in your life. Now, can I guarantee Dad's not going to move tomorrow? No. But the history of this case shows Dad's more stable than Mom. I think that's in your best interest. . . .

The court directed the parties to work out a plan for transitioning the children from Amie's care to Lee's, and also visitation.[5] The court anticipated the children going home with their mother to get their things together and then having Lee bring them back to Iowa to start school. The court indicated that because Lee will have custody of the children that Amie would be responsible for child support. Specific language for the child support provision was left "on the laps of CSRU to deal with."

---

[5] Because the start of school was just around the corner, the court asked the parties for a proposed visitation schedule within a week of the hearing. Amie submitted a proposed visitation schedule five days after the hearing. The record closed on November 3, 2017.

On November 28, 2017, the district court entered its written "Order re Modification." The order stated a "separate order would be entered regarding child support and health insurance assuming the following: For Lee, the court imputes minimum wage (full-time)." Concerning Amie's application to show cause, the order stated: "The court finds Lee has voluntarily reduced his income; however, said reduction is not found to be willful in nature. Amie's Application Alleging Contempt should be continued to allow Lee an opportunity to show compliance with repayment of his child support arrearage." Finally, as to modification of the children's placement, the order stated:

> Lee alleges a substantial change in circumstances warrants a modification of the children's physical care. In particular, he submitted evidence regarding Amie's refusal to abide by the court's orders regarding his visitation; two separate findings of contempt of court (one of them being after the most recent modification proceeding); Amie's "bad mouthing" of him as the children's father; [the older minor child's] request to live with his father; and Amie's frequent moves since entry of the decree in this matter. For the reasons stated on the record, the court finds Lee has proven a substantial change in circumstances.
> Regarding the requirement that Lee prove superior parenting in his effort to modify physical custody of the children, the court is persuaded that Amie's prior acts of violating Lee's parental time with the children is an indicator of her future actions. To the contrary, no evidence was presented that Lee would not honor Amie's relationship in the children's lives if he were to have physical custody. The court also finds Lee is capable of providing more stability for the children than they have experienced since the prior modification proceeding. For the reasons stated on the record, the court finds Lee has proven superior parenting.

The court ordered "primary physical care of [the two children] is transferred from [Amie] to [Lee] effective August 16, 2017."

A few days later, the district court entered an "Order for Modification of Custody, Visitation, Support and Contempt." The CSRU, using Amie's current

income and imputing a full-time minimum-wage salary of $15,068.40 to Lee, determined Amie's support obligation under the guidelines for the two children was $817 per month, then would be reduced to $567 per month when only one child was to be supported. The court's order further stated: "[Lee's] obligation to pay ongoing child support for the children is terminated effective August 16th, 2017. [Amie] shall pay child support in the amount of $817 per month for the child(ren) listed in this order. This amount is effective on August 16th, 2017 and shall continue monthly thereafter." Lee was ordered to pay his child support arrearage at the rate of $178.80 per month.

Amie now appeals.

## II. Standard of Review

We review a district court's modification of a decree, including child-support provisions, de novo. *See In re Marriage of McKenzie*, 709 N.W.2d 528, 531 (Iowa 2006); *In re Marriage of Rietz*, 585 N.W.2d 226, 229 (Iowa 1998). We are not bound by the district court's findings, but we do give weight to those fact-findings, particularly its credibility findings. *See McKenzie*, 709 N.W.2d at 531. Moreover, "we recognize that the district court 'has reasonable discretion in determining whether modification is warranted and that discretion will not be disturbed on appeal unless there is a failure to do equity." *Id*. (cleaned up).[6] Ultimately, the "controlling consideration" is the children's best interests. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). This allows appellate courts "the

---

[6] "Cleaned up" is a relatively new parenthetical used to indicate that internal quotation marks, alterations, and citations have been omitted from quotations for readability purposes. *See United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018); Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (Fall 2017).

flexibility necessary to consider unique custody issues on a case-by-case basis."
*See id.* (cleaned up).

### III. Discussion.

On appeal, Amie challenges the district court's modification in four respects. She argues the court erred in changing the minor children's physical care from her to Lee. She also asserts the court erred in imputing to Lee only minimum-wage income, given his voluntary reduction of income, and in not finding him in contempt for his failure to pay the child support as decreed. Finally, she argues the court erred in making her support obligation retroactive to the date of the hearing. We address her arguments in turn.[7]

### A. Modification of Physical Care.

"A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered," as well as "a superior ability to minister to the needs of the children." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). This is a heavy burden. *See id.* Nevertheless, modification may be warranted "when the parents simply cannot cooperate or communicate in dealing with their children." *See id.* at 441 (cleaned up).

---

[7] Lee points out that Amie's brief does not adequately explain how the alleged errors claimed on appeal were preserved. We agree, as the timely filing of a notice of appeal "has nothing to do with error preservation." *State v. Lange*, 831 N.W.2d 844, 846-47 (Iowa Ct. App. 2013); *see also* Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice*, 55 Drake L. Rev. 39, 48 (Fall 2006) (explaining that "[a]s a general rule, the error preservation rules require a party to raise an issue in the trial court and obtain a ruling from the trial court") (footnote omitted). However, because the issues Amie raises were decided by the district court, we find her claims were preserved for our review.

We agree with the district court that this was a close call. Upon our de novo review of the record, we find no reason to disturb the district court's determination that Lee established the necessary proof to support modification of the children's placement. We will not go as far as the district court to say Amie failed to take court orders seriously and lived a "nomadic lifestyle." The children's overall success while in Amie's physical care despite several moves show Amie is a good mother and the children thrived in her care. But there is no question Amie made a few bad choices that did not encourage the children's relationship with Lee, and those decisions, coupled with all the facts before us, tips the scales sufficiently to support modification. At this point in time, with the older minor child nearly an adult, as well as that child's wish to live with his father, further modification would not be in the children's best interests. Considering the children's best interests, we affirm the district court's order modifying the children's placement.

### B. Reduction of Income.

Lee's 2015 tax return shows his $55,552 in wages for the year as a truck driver.[8] In 2016, his wages as a truck driver were less—$32,216—because he quit his job in August.[9] He then started an all-terrain vehicle (ATV) repair business.

*In re Marriage of McKenzie* is directly on point. *See* 709 N.W.2d at 534. In that case, the father said he voluntarily left his employment, not to avoid his child-support obligation, but to be closer to his paramour. *See id.* at 533-34. However,

---

[8] Of that amount, Lee claimed $700 in business expenses and $14,982 in meal and entertainment expenses.

[9] Lee claimed $10,944 in meal and entertainment expenses with regard to his truck driving income.

the Iowa Supreme Court found that explanation insufficient to justify modifying the

child-support award, reasoning:

> [O]ur first consideration under these circumstances is not what is in the best interest of [the father], but what is in the best interest of his child. If we consider [the father's] reason for moving as the primary consideration in deciding this case, we would place his selfish desires over the welfare of his child and the custodial parent, not provide for the needs of his child, and create a substantial injustice between the parties.
>
> [The father] was not free to plan his future without regard to his obligation to his former wife and child. At the time [the father] left Iowa, he knew he had a pre-existing duty to provide monthly child support in the sum of $495 for his daughter and that he could earn $45,260 annually if he stayed in Iowa. Even though he thought he could earn a comparable salary in South Carolina at the time he quit his job in Iowa, he had no idea what his earning capacity in South Carolina would be. Under these circumstances, [the father's] desire for self-fulfillment is outweighed by the pre-existing duty he had to his former spouse to provide adequate support for his minor child.
>
> [The father] also claims his new job and expenses would not allow him to pay child support based on an income other than his actual earnings. Even if true, under the special circumstances of this case we should still base [the father's] child support obligation on his earning capacity. Although [the father's] income dramatically declined, he was able to make the move to another state without a change in his and [his paramour's] lifestyle because their combined income in South Carolina is substantially the same as what their combined income would have been if they stayed in Iowa.
>
> Finally, if we were to allow a reduction in [the father's] child support obligation based on his actual earnings, we would be requiring [the mother] to increase her contribution for the support of [their child]. [The mother] should not be forced to make up [the father's] reduced child support so [the father] can start a new life with his new wife in South Carolina, when his combined family income in South Carolina is substantially similar to the combined family income he had available to him in Iowa.
>
> Consequently, a strict application of the child support guidelines using [the father's] actual earnings under the circumstances of this case would not provide for the needs of his child and would result in a substantial injustice between the parties. Therefore, it is necessary to use [the father's] earning capacity to determine his child support obligation under our guidelines.

*Id.* at 534.

In this case, the record shows Lee left his job with little regard to whether he would be able to continue to support his children as ordered by the court. At some point, the record is not clear, Lee moved from his home in Red Oak and moved in with his girlfriend in Marengo. He did not look for a truck-driving job in the Marengo area. Although he had some construction work experience, he did not look into construction work in the Marengo area. Instead, he started an ATV repair business called "E-Lee-T ATV Sales and Service," "something [he] was darn good at and enjoyed doing and the possibility being able to make some money doing it and having a good business, we [Lee and his girlfriend] thought it was a smart move." He buys, resells, repairs, and services any make and model of ATV. Asked at the August 2017 hearing whether the business was going to make any money, Lee responded, "Right now and that, with the projections that I had predicted starting off, I'm hitting my projections. I'm very satisfied with where I'm at." He saw growth in the business and thought the business had the potential for replacing the income he had from his trucking work. The facts belie his optimism.

Lee's 2016 income tax return reports a $17,850 loss for the business which includes a $7000 expense for tools. Lee said he did not "personally" have the cash for the tools but that it was "our money but not mine." Lee explained "our" meant he and his girlfriend. In a January 2017 financial statement submitted to the CSRU, Lee listed his occupation as ATV repair and noted "just setting up no income." In an April 18, 2017 affidavit of financial status filed with the court, Lee reported income of "$0.00 per month." His financial affidavit filed just before the August

2017 hearing shows his gross income as $1000 per month,[10] and net income as $109.83 per month. The same affidavit shows his personal monthly expenses as $2723.00.[11] The business's sales tax quarterly return reports total sales of $3,000.00 for the period April 1 through June 30, 2017.

While we certainly hope Lee's business endeavor, his "smart move," becomes successful, the burden is not on Amie to fully support their children so Lee can tinker around with ATVs. The record is unclear as to how much support Lee's paramour of four years provides, but there is no indication that Lee's lifestyle has changed since leaving his employment. Like in *McKenzie*, we think "a strict application of the child support guidelines" using Lee's actual earnings under the circumstances of this case would not provide for the needs of his children and would result in a substantial injustice between the parties. *See id.* Therefore, it is necessary to use Lee's earning capacity to calculate Amie's child support obligation under the guidelines.

Having concluded we must use Lee's earning capacity to establish Amie's child support obligation, we must now determine Lee's earning capacity. *See id.* The *McKenzie* court found in its case that the

> best indication of [the father's] earning capacity is the salary he made at [his former employer] before he quit to move to South Carolina because he worked there for twenty-two years and we find at the time he quit there was no indication that he could not have continued in this position for the period he was obligated to provide child support for [his child]. Thus, we fix his earning capacity at $45,260.

---

[10] Lee admitted at the hearing that $12,000 a year is less than minimum wage.

[11] Though Lee reported on his financial affidavit he had a monthly house payment of $500, he testified he lived with his paramour and did not contribute to her house payment. He claimed the amount listed on his financial affidavit was for his house payment/rent for the property he used to live in but still owns. However, he further testified he had renters in that property that "basically just pay[] the payment on the house," which he did not report, to offset his payment obligation.

*Id.* Similarly, we see no indication in this record that Lee could not have continued in a truck-driving position for the period he was obligated to provide child support for his children. We therefore fix his earning capacity at $40,000. Accordingly, we remand the issue to the district court to recalculate Amie's child support obligation.

### C. Retroactive Support.

Amie argues the court erred in ordering her to pay child support retroactively, asserting "[t]he judge's directives regarding the changed support becoming effective upon entry of the decree should have been followed and the change in support obligation and amount, effective November, 2017 rather than August, 2017." For the following reasons, we disagree.

Here, the court's oral ruling in August 2017 transferred physical care of the children to Lee and determined the support award should be modified. The court told Amie, "Mom, because [Lee] will have custody, you will owe child support," and "I am going to direct [the CSRU] to calculate child support effective on the filing of the order," but for reasons not reflected in our record, the written order was not filed until a few months thereafter. While the district court's modification decree is generally "effective when the court files it with the clerk of court," *In re Marriage of Johnson*, 781 N.W.2d 553, 559 (Iowa 2010) (citing Iowa R. Civ. P. 1.453), Iowa Code section 598.21C(5) (2017) expressly allows child support awards to be "retroactively modified." Specifically, that section provides:

> **Retroactivity of modification**. Judgments for child support or child support awards entered pursuant to this chapter . . . may be retroactively modified only from three months after the date the notice of the pending petition for modification is served on the opposing party. . . . The prohibition of retroactive modification does not bar the child support recovery unit from obtaining orders for

accrued support for previous time periods. Any retroactive modification which increases the amount of child support or any order for accrued support under this subsection shall include a periodic payment plan. A retroactive modification shall not be regarded as a delinquency unless there are subsequent failures to make payments in accordance with the periodic payment plan.

It is true that Iowa case law prevents courts from imposing a retroactive reduction in child support before modification is ordered. *See In re Marriage of Barker*, 600 N.W.2d 321, 323-24 (Iowa 1999); *see also In re Marriage of Herum*, No. 17-1161, 2018 WL 2084852, at *8 (Iowa App. May 2, 2018). However, retroactive increases are permitted. *See Barker*, 600 N.W.2d at 323-24; *see also Herum*, 2018 WL 2084852 at *9 n.13. Amie's argument here is specific to her support obligation—"The District Court Order Erred In Ordering Amie . . . to Pay Child Support to Lee . . . Effective August 1, 2017." This is a retroactive increase of support. Overall, since the children were actually transferred to Lee's physical care in or about August 2017 and Amie's argument is specific to her own support obligation, we do not find the district court acted improperly in ordering her support payments to start the time of its ruling from the bench.

### D. Contempt.

Amie also argues the court erred in not finding Lee in contempt. However, we only review contempt actions for errors of law if there was an initial finding of contempt. *See In re Marriage of Swan*, 526 N.W.2d 320, 326-27 (Iowa 1995). This is because Iowa Code section 598.23 provides

> 1. If a person against whom a temporary order or final decree has been entered willfully disobeys the order or decree, the person *may* be cited and punished by the court for contempt and be committed to the county jail for a period of time not to exceed thirty days for each offense.

> 2. The court *may*, as an alternative to punishment for contempt, make an order . . . .

(Emphasis added.) *See also Swan*, 526 N.W.2d at 327. Use of the word "'may' confers a power." Iowa Code § 4.1(3); *see also Swan*, 526 N.W.2d at 327. Consequently, the district court "is not required to hold a party in contempt even though the elements of contempt may exist." *Swan*, 526 N.W.2d at 327. Ultimately, the district court has "broad discretion and unless this discretion is grossly abused, the court's decision must stand." *Id.* (cleaned up).

Here, even if we find Lee willfully disobeyed the court's order in failing, once again, to pay his court-ordered child-support, we cannot say the district court's decision otherwise was a gross abuse of its discretion. The court clearly recognized Lee had not complied with the support order and gave him the opportunity to become current, which he did. We do not find the court abused its discretion when it did not hold Lee in contempt for his failure to pay his child support as ordered.

### E. Appellate Attorney Fees.

Finally, both parties have requested an award of appellate attorney fees. Appellate attorney fees are not a matter of right but rest within our discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." Based on the foregoing, we decline to award either party appellate attorney fees.

*IV. Conclusion.*

Because it is necessary to use Lee's earning capacity in calculating Amie's child support obligation under our child support guidelines to provide for the needs of the parties' minor children and do justice between the parties under the special circumstances of this case, we modify the court's order and remand for the district court to recalculate Amie's child support obligation. We affirm in all other respects. We do not retain jurisdiction. Any costs are assessed equally to the parties.

**AFFIRMED AS MODIFIED AND REMANDED.**