**IN THE COURT OF APPEALS OF IOWA**

No. 20-0216
Filed February 17, 2021

**IN RE THE MARRIAGE OF JULIE ANN DUKE
AND JEREMIAH DUKE**

**Upon the Petition of
JULIE ANN DUKE,**
        Petitioner-Appellee,

**And Concerning
JEREMIAH DUKE,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Warren County, Terry R. Rickers,

Judge.


        Jeremiah Duke appeals from several provisions of the district court's

dissolution decree.  **AFFIRMED.**



        Benjamin Bragg of Bragg Law Firm, Clive, for appellant.

        Robert L. Stuyvesant of Stuyvesant, Benton & Judisch, Carlisle, for

appellee.



        Considered by Bower, C.J., and Vaitheswaran and Greer, JJ.

**VAITHESWARAN, Judge.**

Jeremiah Duke and Julie Ritter, formerly known as Julie Duke, married in 2013 and divorced in 2020. They have two children, born in 2014 and 2015. The district court (1) granted Ritter sole legal custody and physical care of the children, subject to supervised visitation with Duke; (2) ordered Duke to pay Ritter child support of $906.90 per month; (3) awarded Duke his businesses and transferred an F-250 truck to Ritter; and (4) granted Ritter trial attorney fees. On appeal, Duke challenges these portions of the dissolution decree.

## I.     *Legal Custody and Physical Care*

Under Iowa Code section 598.1(3) (2018), "[j]oint custody" or "joint legal custody" "means an award of legal custody of a minor child to both parents jointly under which both parents have legal custodial rights and responsibilities toward the child and under which neither parent has legal custodial rights superior to those of the other parent." If a court "does not grant joint custody, . . . the court shall cite clear and convincing evidence, pursuant to the factors in subsection 3, that joint custody is unreasonable and not in the best interest of the child." Iowa Code § 598.41(2)(b). One of the factors enumerated in subsection 3 is "[w]hether a history of domestic abuse, as defined in section 236.2, exists." *Id.* § 598.41(3)(j); *see also* Iowa Code §§ 236.2(2)(a)–(c); 708.1(2)(a)–(b). Where "the court finds that a history of domestic abuse exists," there is "a rebuttable presumption against the awarding of joint custody." *Id.* § 598.41(1)(b). If unrebutted, this factor "shall outweigh consideration of any other factor specified in [section 598.41(3)] in the determination of the awarding of custody." *Id.* § 598.41(2)(c).

The district court granted Ritter sole legal custody and physical care of the children after determining she "provided unrebutted evidence that [Duke] physically and sexually abused her during the marriage." On appeal, Duke argues the district court "gave overly substantial weight to [Ritter's] testimony" and "completely ignored [his] testimony and that of his witnesses." In his view, "a careful examination of the record shows it is not that clear."

The district court did indeed find that Ritter "provided more credible testimony." We give weight to the credibility finding. *See In re Marriage of Forbes*, 570 N.W.2d, 757, 759 (Iowa 1997) (noting the district court "had an opportunity to view the demeanor of the witnesses when testifying"). We proceed to a de novo review of the record.

Ritter described several episodes of abuse at the hands of Duke. On one occasion, Duke drove at high rates of speed with Ritter in the passenger seat, bashed her head into the dash area of the vehicle, stopped and dragged her out of the car and into a shed on their property, smoked methamphetamine and "blew it in [her] face," and "beat [her] up and" held her "at knifepoint." He then raped her, gave her a black eye, and handcuffed her to the truck as they went to pick up the children. On another occasion, Ritter testified Duke chased her with an ax.

Ritter left the home and moved in with her family. After Duke threatened the safety of family members, Ritter moved into her own apartment. Duke came to her apartment building and assaulted her. Ritter called 911.

Following the call, police apprehended Duke and the State charged him with third-degree harassment and domestic abuse assault. Duke pled guilty to the assault charge, and the district court entered a criminal no-contact order. Ritter

separately filed a petition for relief from domestic abuse seeking an additional protective order that would cover the children. The district court granted her request and issued a temporary protective order followed by a one-year protective order by consent agreement.[1] The State subsequently charged Duke with violating the criminal no-contact order. The district court adjudged him guilty and entered a sentencing no contact order that was not slated to expire until the spring of 2024. These court proceedings corroborated Ritter's testimony. *See In re Marriage of Cloyed*, No. 08-0287, 2009 WL 400379, at *2 (Iowa Ct. App. Feb. 19, 2009) ("In determining whether a history of abuse exists, we may consider, among other things, the issuance of a protective order . . . the arrest of an individual in response to a report of alleged domestic abuse, or a conviction for domestic abuse assault.").

One of Duke's witnesses also corroborated Ritter's testimony. The witness, "a retired policeman" who "lived three houses away from [Duke] when he was growing up" and interacted with him in the year preceding trial, testified that he "know[s] there's been domestic for quite a long period of time, which is sad to say."

This evidence established a rebuttable presumption of a history of domestic abuse. Although Duke disputed the ax episode, the court chose to believe Ritter over Duke where the testimony diverged, as was its prerogative. *See In re Marriage of Davis*, No. 16-1574, 2017 WL 4570407, at *2 (Iowa Ct. App. Oct. 11, 2017) (noting the "testimony, if believed, might have been sufficient to rebut the presumption of a history of domestic abuse" but giving weight to the district court's credibility finding in favor of the other party). Notably, Duke did not rebut the

---

[1] After Ritter filed the dissolution and domestic abuse petitions, Duke filed his own petition for relief from domestic abuse. The district court dismissed the petition.

5

testimony of his assault and rape of Ritter, and he pled guilty to the later assault at her apartment building. Because the presumption of a history of domestic abuse based on those assaults was unrebutted, the district court acted equitably in granting Ritter sole legal custody of the children.

Duke next argues, "If the evidence suggests that there was not a history of domestic violence, the issues of legal and physical custody need to be revisited." Having concluded that there was a history of domestic violence, we further conclude the district court acted equitably in granting Ritter physical care of the children.[2]

Finally, Duke argues, "If the Court were not to grant joint physical custody, the visitation requirements imposed on [him] should be loosened." He specifically challenges the district court's decision to require supervision of visits for the first three months. In that context, he also argues the court should have considered Ritter's "mental wellbeing" and we should require her to "provide a mental health evaluation."

The court imposed the restriction on Duke's visitation only after expressing skepticism about his denial of recent drug use. In any event, we need not address the equities of imposing the restriction because, with the passage of time, Duke's challenge to the restriction is moot.

---

[2] In addition to the history of domestic abuse, the court found Duke was not "honest . . . regarding his mental health and substance abuse." The record supports those findings.

As for Duke's request for an order requiring Ritter to undergo a mental-health evaluation, the request does not advance his bid to have his visitation rights loosened. The scope of those rights was entirely within his control.

## II.     *Property Division*

Duke owned three construction-related businesses. Ritter obtained a valuation report for two of the business, which were run as sole proprietorships.[3] The fair market value was determined to be $186,200 as of December 31, 2017. The district court adopted the valuation figure and awarded the businesses to Duke. The court also awarded him a dump truck flat bed and a 2019 Ford F-250 truck. With respect to the truck, the court ordered Duke to "refinance the loan/lien on this vehicle and otherwise remove [Ritter] from such financial obligation within thirty (60) [(sic)] days of the Court's entry of this decree." The court further stated, "In the event [Duke] fails to refinance the 2019 Ford F-250 within the required time period, [Duke] shall transfer title to said vehicle over to [Ritter]." Duke concedes he failed to refinance the vehicle. The truck was transferred to Ritter.

On appeal, Duke agrees with the court's valuation of his businesses as of the end of 2017, but he argues that the value decreased in the ensuing two years because many of his tools were stolen and his legal troubles resulted in a decline in large jobs. As a result, he asserts the property division is inequitable and "to rectify this inequitable distribution," we should return the F-250 truck to him. He values the truck at "$50,000."

---

[3] The third business, which installed glass tinting film, was not valued. Ritter testified she was listed as an owner of the corporation. She did not know whether the company was still in existence. In 2017, the company had gross receipts of $1912.

Duke's loss of his truck was a problem of his own making. Had he timely refinanced it, the vehicle would be his. *See In re Marriage of Mulder*, No. 12-1991, 2013 WL 4010244, at *2 (Iowa Ct. App. Aug. 7, 2013) (finding that "refinancing [the vehicle] to remove [a party's] name from the note [would] create no additional burden"). In any event, the truck was worth far less than the $50,000 value he now ascribes to it. According to one of his financial statements, it was worth $7000 after subtracting the encumbrance. Although the loan on the truck was paid down further prior to trial, the value was still no more than $13,000 by the time of trial, exclusive of depreciation. Accordingly, the truck did not skew the property division in favor of Ritter to the extent suggested by Duke. As for the claimed devaluation of his businesses, Duke failed to quantify the losses he suffered as a result of the tool theft and his criminal troubles. In the absence of a more recent valuation figure, we affirm the value adopted by the district court and the property division in its entirety.

### III.    Child Support

The amount of child support is determined by use of the child support guidelines. *See* Iowa Ct. R. 9.2. In calculating child support, "Gross income from self-employment is self-employment gross income less reasonable business expenses." *See* Iowa Ct. R. 9.5(1)(c).

The district court determined Duke's income was "somewhere between" the $80,733 annual earnings figure advocated by Ritter and the $24,930 sum proposed by him. The court found the business valuation report contained the "most reliable" indicator of Duke's earnings before interest and taxes and the three year average was $21,728. After adding the claimed average depreciation of

$25,141 over those years, the court arrived at "[e]arnings [b]efore [i]nterest, [t]axes, [d]epreciation, and [a]mortization" of $46,869. The court then stated:

> Assuming that all of the depreciable business assets have a five-year depreciable life (an assumption that likely favors [Duke]), the Court will only deduct twenty percent (20%) of the average accelerated depreciation deduction in computing [Duke] EBIT. Eighty percent (80%) of $25,141.00 is $20,113.00 (rounded). The parties' 2015, 2016, and 2017 tax returns show additional Form K-1 income on Schedule E that averages $3,565.00 per year (rounded). Consequently, [Duke's] average income before taxes is $48,819.00.

The court determined that his income together with Ritter's undisputed annual salary of $49,880 resulted in a monthly child support obligation of $906.90.

Duke takes issue with the district court's depreciation calculation. He argues the court engaged in an "apples to oranges comparison" by taking twenty percent of "the average accelerated depreciation for those three years." In his view, the court "should have calculated anew what the straight-line depreciation values would have been for each of those years and creat[ed] a new total operating expenses amount" which, when subtracted from his gross profits, would result in average gross income of $21,614.

Duke's present estimate of his income is inconsistent with the figure he used in his proposed child support guidelines. As the court found, Duke stated his annual income was $24,930, not $21,614. Duke also did not espouse his current view of depreciation. As an example, he now suggests the district court should have used a depreciation figure of $34,392 for the 2017 taxable year. However, Schedule C of his 2017 tax return listed depreciation of $27,704.[4] The district court was not given the $34,392 figure or the underlying calculations he now uses. *See*

---

[4] Ritter's business valuation report listed depreciation of $32,822 for 2017.

*In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991) ("The court must determine the parent's current monthly income from the most reliable evidence presented."); *In re Marriage of Wheeler*, No. 19-1268, 2020 WL 4201000, at *4 (Iowa Ct. App. July 22, 2020) ("Without more specific and credible information to base a calculation and with the district court's credibility findings, we cannot say the district court made a mistake."); *cf. In re Marriage of Waters*, No. 08-1807, 2009 WL 4069373, at *6 (Iowa Ct. App. Nov. 25, 2009) (noting a party "prepared a detailed exhibit showing what the depreciation deduction would have been if straight-line depreciation had been used").

Even if we were to overlook these evidentiary concerns, the supreme court has vested the decision of whether and how to treat depreciation for child support purposes in the sound discretion of the district court, after consideration of the particular circumstances of the case. *See In re Marriage of Gaer*, 476 N.W.2d 324, 328 (Iowa 1991). We conclude "the evidence supports and equity favors the district court's determination of" Duke's "annual income for purposes of applying the [child support] guidelines." *In re Marriage of McDermott*, 827 N.W.2d 671, 685 (Iowa 2013) (affirming the district court's calculation of income notwithstanding the court's failure to adjust his section 179 depreciation expenses); *In re Marriage of Ruth*, No. 05-0440, 2006 WL 468773, at *3 (Iowa Ct. App. Mar. 1, 2006) ("Allowing . . . a greater depreciation deduction would . . . result in a level of child support inadequate to meet the children's needs, and would create a substantial injustice between the parties.").

Duke also suggests there "were some additional miscalculations" in the district court's child support determination. He asserts (1) "[t]he court, in

determining the cost of health insurance, only based the cost on one rather than two children" and, (2) as a result of an error in software used to calculate support, "the state tax deduction for federal tax liability" was excluded.

Beginning with the health insurance calculation, the child support guidelines state:

> The allowable child(ren)'s portion of the health insurance premium will be calculated as follows:
> (1) For a health benefit plan covering multiple individuals, including the child(ren) in the pending action, the allowable child(ren)'s portion is the amount of the premium cost for such coverage to the parent or stepparent that is in excess of the premium cost for single coverage, divided by the number of individuals enrolled in the health benefit plan, excluding the person providing the insurance, and then multiplied by the number of children who are the subject of the pending action.

Iowa R. Civ. P. 9.14(5)(b)(1). The district court adopted Ritter's figure for the allowable children's portion—$120.58—rather than Duke's proposed figure of $148. We discern no inequity in the district court's use of that figure.

We turn to the court's treatment of the federal tax liability deduction. It is true the child support guidelines attached to the dissolution decree did not afford Duke a state deduction for federal tax liability even though the court found federal liability of $3710.91. But the same omission appeared in the court's calculation of Ritter's income. She had federal tax liability $3465, which was not listed as a state deduction. The reason for the omission is not apparent from the record. While Duke now posits a software glitch, the absence of evidence supporting that explanation together with the similar income and deduction figures adopted by the court and the court's identical treatment of the deduction for both parents lead us to conclude the omission would have resulted in a negligible change in the child

support owed by Duke.  *See In re Marriage of Christensen*, No. 19-1707, 2021 WL 209246, at *4 (Iowa Ct. App. Jan. 21, 2021) (declining to remand for correction of errors in child support calculations after finding the errors would result in a negligible change in the amount of support).  We affirm the child support award.

## IV.     Attorney Fees

Duke contends the district court abused its discretion in ordering him to pay $7500 toward Ritter's attorney fee obligation.  We review an award for an abuse of discretion.  *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).

Ritter filed an affidavit documenting total fees of $11,894.98 in connection with preparing for and attending contempt hearings and the dissolution trial. Although the district court found the parties had similar annual earnings, we believe the additional time Ritter was forced to expend justified the order requiring Duke to pay a portion of her trial fees.  We discern no abuse of discretion in the court's award.

Both parties seek appellate attorney fees.  Because Ritter had to defend the appeal, we order Duke to pay $2000 toward her attorney fee obligation.

**AFFIRMED.**