# IN THE COURT OF APPEALS OF IOWA

No. 22-0480
Filed March 29, 2023

IN RE THE MARRIAGE OF BRENT A. PRENGER
AND KIMBERLY F. PRENGER

Upon the Petition of
BRENT A. PRENGER,
        Petitioner-Appellant/Cross-Appellee,

And Concerning
KIMBERLY F. PRENGER, n/k/a KIMBERLY F. KIEWIET,
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Michael Jacobsen,

Judge.

        Both parties appeal from several provisions of the decree dissolving their

marriage. **AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED AND**

**REMANDED ON CROSS-APPEAL.**


        David E. Brick and Allison M. Steuterman of Brick Gentry, P.C., West Des

Moines, for appellant/cross-appellee.

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee/cross-appellant.


        Considered by Bower, C.J., and Greer and Buller, JJ.

**GREER, Judge.**

After the district court dissolved the marriage of Brent Prenger and Kimberly (Kim) Prenger (now Kiewiet), both parties appealed over issues not covered by the stipulation they entered.[1]  Brent raises nine separate issues for our consideration, and Kim asks us to address two concerns.  We analyze their claims in separate sections and affirm the district court decree, except we modify the language requiring any and all costs of attendance at a private school, the responsibility for the extracurricular expenses of the children, and the amount of the property equalization payment.  We remand for a determination of reasonable appellate attorney fees for Kim.

**Factual Background.**

Brent and Kim were married on May 20, 2006.  They had two children, born in 2009 and 2012.  In September of 2018, they separated, which was followed by Brent's filing for dissolution of marriage in October.  The trial occurred several years later in October 2021.

Both parties were forty-four years old at the time of trial.  Brent is one of seven owners of Five Star F.A., Inc. (FSFA)[2] and serves as the vice president and treasurer.  He graduated from Simpson College with a finance and business degree in 2000.  Kim has a bachelor's degree in nursing and maintains her license, but she has not worked as a nurse since 2003.  From that year on, Kim had

---

[1] The partial stipulation primarily concerned custody and visitation issues, and the district court incorporated it into the decree.

[2] This corporation operates several stores under the names "Flooring America" and "Floors Direct."  The company started in 2002, before the marriage.

success working in pharmaceutical sales until 2016 but then, with Brent's agreement, quit to work as a stay-at-home mother. Both parties are in good health.

Before marriage, the parties entered into a premarital agreement that allowed each to retain property held before the marriage and also any after-acquired property not placed in joint ownership. No one disputes the validity of the premarital agreement. During the marriage, while Kim and Brent managed to accumulate assets, they also spent a great deal to sustain a high standard of living, which was funded primarily by Brent's earnings after 2015. They now both appeal from several issues related to the support awarded, the additional expenses Brent must pay, the property award, and Kim's attorney fees. As we analyze their claims, other facts important to those issues will be developed.

**Standards of Review.**

Dissolution-of-marriage actions are reviewed de novo. *In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020) (citing Iowa R. App. P. 6.907). "Accordingly, we examine the entire record and adjudicate anew the issue of the property distribution." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We give weight to the findings of the district court, particularly about the credibility of witnesses, but we are not bound by them. *Id.* A district court's ruling will be not be disturbed unless the ruling fails to do equity. *Id.*

We review an award of trial attorney fees in a dissolution-of-marriage action for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Id.* (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)). "Appellate attorney fees are awarded upon our discretion

and are not a matter of right." *In re Marriage of Heiar*, 954 N.W.2d 464, 473 (Iowa Ct. App. 2020).

**Brent's Issues on Appeal.**

Brent takes issue with several findings of the district court.

**The Support Awards—Determining Net Income.**

Three of Brent's appeal points concern the support awards. Two of those three assert the district court erred in the determination of the income used to calculate the awards for child support and alimony—Brent's attributed income is too high and Kim should be attributed some income. The third concern is over the amount of spousal support ordered. The district court ordered Brent to pay $5500 monthly in spousal support for five years. The child support award requires Brent to pay $2209 per month for the support of the two minor children. To arrive at those numbers, the district court based the support awards on the four-year average of Brent's income as reflected on the tax returns and attributed no income to Kim. Although Kim receives income from her family farm partnership, she testified that the cash she is paid is only enough to cover the federal and state taxes due on her income.[3]

Before we dive into the rationale behind each award of support, we examine how the district court determined the parties' earnings. Brent argues that the district court incorrectly calculated his average earnings over the four years (2017 through 2020) at $347,898.[4] From his standpoint, a more equitable approach

---

[3] Her reported income from the farm partnership included $80,631 (2017), $55,959 (2018), $431,580 (2019), and $133,109 (2020).
[4] Brent filed a financial affidavit in January 2019, reporting annual income of $348,925.

would be to use the average of income earned in 2019 and 2020; making his average annual gross income $203,932 because those years reflect the reality of his business during the COVID-19 pandemic and after. Because of the pandemic and its impact upon his business, Brent urges he cannot make the income he made in the pre-pandemic years and so 2017 and 2018 should not be taken into account. To support his forecast, Brent also submitted interim reports for 2021 showing a similar slowdown in his company earnings and profit.[5] He emphasizes the reduction in earnings is not self-imposed, appears to be more than temporary, and is not something he can control.

Through his job at FSFA, Brent earns a base annual salary of $108,000. Generally, he is also paid a bonus each year and then the corporation's remaining profit is paid as a dividend payment. He also receives his share of rental income from a real estate holding company, which will be discussed later. The FSFA bonus is based upon the net profit of the company. Brent makes a compelling argument over the declining trend of his income as shown by his tax returns and the company income and expense records. To be sure, the pandemic created hurdles for many businesses, including the shutdown Brent described, labor force concerns, and supply chain issues. He also pointed to increased competition from a national vendor that moved into the retail area shortly before the dissolution trial. We have no way to know if these hurdles are temporary or permanent. Time will tell.

---

[5] The company's audited financial statements show a net income for the first six months of 2021 of more than $55,000 compared to around $170,000 in 2020 and $758,189 in 2019 over the same time period. We did not consider the more than $660,000 in one-time monies received by businesses during the pandemic in 2021.

Kim maintains the district court's determination of income for both her and Brent is correct. On top of that, Kim draws our attention to the "perks" received by Brent from his company that were not considered in the calculation of his actual earnings but were referenced by the district court. At no cost, Brent's company provides him a vehicle and covers the cost for insurance, gas, and maintenance; his cell phone, laptop computer, and iPad; family health insurance; "travel points" i.e. airline miles earned from use of the company credit card; $500 per month toward his country club membership; and free tickets for sporting and other entertainment events that are not calculated into his actual earnings for support purposes. We take these payments into account as well. *See In re Marriage of Lee*, 486 N.W.2d 302, 305 (Iowa 1992) ("The guidelines do not limit the definition of gross income to that income reportable for federal income tax purposes.").

In cases where a spouse has fluctuating income, we have recognized that "it generally is best to use an average of income from a period that accurately reflects the fluctuations in income." *In re Marriage of Cossel*, 487 N.W.2d 679, 681 (Iowa Ct. App.1992). We afford the district court some discretion in making these computations and do not quibble with the four-year average formula used here. *See In re Marriage of Kupferschmidt*, 705 N.W.2d 327, 334 (Iowa Ct. App. 2005). Using the four-year term balances the good years with the bad years and assumes not every year will be influenced by pandemic conditions. But, there was a complication in finding the accurate number for one of those years. We note that in 2020, because of cash flow concerns, while Brent reported income of $214,377,

$33,333 of that was a loan from his 401(k).[6] Because the loan does not represent earnings, it is fair to only consider his 2020 income less that loan amount, so actual earnings of $181,044. We do not have the benefit of the district court's calculation of Brent's average earnings over the four years, but upon our de novo review, we find Brent's average earnings over the four years is $339,565 annually.[7] In making this calculation, we use these numbers from the tax returns:

| YEAR | SALARY + BONUS | DIVIDENDS | TOTAL INCOME |
| --- | --- | --- | --- |
| 2017 | $143,395 | $225,943 | $369,338 |
| 2018 | $195,254 | $269,692 | $464,946 |
| 2019 | $199,383 | $143,548 | $342,931 |
| 2020 | $137,269 | $43,775 | $181,044 |

Thus, the district court overstated Brent's average annual income by $8333, or about $694 per month. Considering the other benefits afforded to Brent that are not reported as income but allow him more discretionary income and the fact we are considering pandemic years in this calculation, we do not find the district court's determination of earnings to be so far off base to warrant a modification of the support orders. *See Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005) (finding extra company payments reasonably expected to be received can be considered to establish gross income of a party).

As a last factor to consider, Brent also disagrees with the district court's determination that Kim not be imputed any income for support calculation

---

[6] Brent testified that he took advantage of a government initiative that allowed 401(k) funds to be withdrawn, without penalty, to help sustain individuals during the pandemic.

[7] We take Brent's total income over the four years ($1,358,259) and divide it by four, equaling $339,564.75, which we round up to $339,565.

purposes. Although Kim has an established earning capacity, having earned $147,591 in 2015, the reality is that, by agreement, she is not employed outside of the home now. Because the spousal obligation is short-term, we do not find it inequitable to attribute no income to her. Likely, once her spousal support ends, she will rejoin the workforce and there may be a need to revisit the child support. Now, with the income of the parties established, we review the support awards.

*Spousal Support.*

At trial, Kim requested nine years of spousal support because that was when the youngest would graduate from high school. Brent countered with a four-year term; the district court landed on a five-year award of $5500 monthly but did not characterize what type of alimony was being awarded. *See In re Marriage of Sokol*, 985 N.W.2d. 177, 188 (Iowa 2023) (Mansfield, J., concurring in part and dissenting in part) (noting our precedents now recognize four forms of spousal support: traditional, reimbursement, rehabilitative, and transitional, but courts can award "hybrid" awards depending on the goals to accomplish). Kim characterizes her request for nine years of spousal support as transitional, but that would not fit into the parameters set by our supreme court. *See id.* at 187 (recognizing an award of "transitional spousal support is focused on solving a short term-term liquidity issue" and "generally should not exceed one year in duration").

Examining Kim's income situation, the district court noted that she had only been out of the workforce since 2016, earned more than $147,000 in 2015 when she was employed, maintained her nursing license, and receives income from her family farm. And, the district court believed Kim was capable of obtaining employment outside the home. But, the district court recognized that the parties

agreed Kim should stop working because she was not happy with her job at the time and they felt she should handle the caretaking role of the family. With regard to her active nursing license, Kim testified that it would "take a lot . . . to get back up to speed to work in the clinical world as a nurse" and she had no desire to return to nursing in any event.

Accepting the five-year term, Brent only asks that we claw back the amount from $5500 per month to $2500 per month. Brent believes Kim should, at the very least, seek part-time employment. Over and above the spousal support payment, Brent argues he pays child support plus all of the uninsured medical expenses for the children, their school tuition, and the children's computer and cell phone expense; he claims that all of those are more than he can afford.

Starting with the premise that both parties agree some amount of alimony should be awarded, we cannot say that the district court abused its discretion here. *See id.* at 182 (cautioning that an appellate court should avoid tinkering with spousal-support awards and disturb the award only when there is a failure to do equity). These parties were married for more than fifteen years and since 2016, Kim has been a stay-at-home mother under their joint agreement. Both parties posted expenses representing a high standard of living with Kim reporting monthly expenses of over $17,000 in her trial affidavit of financial status and Brent confirming monthly expenses close to $11,000 in his.[8] At trial, Kim described a "comfortable lifestyle" with multiple vacations, traveling first class, and never

---

[8] We note both parents included the school tuition in the monthly expenses they itemized. And if we remove discretionary spending from their itemization of expenses, Kim has monthly expense of approximately $10,500 and Brent's equal close to $8300, including the tuition cost on his side of the ledger.

needing for anything they wanted. Under the temporary orders period of the dissolution proceedings, Brent paid $9512[9] to Kim each month. Under the decree, Brent is still required to continue paying some of those previous obligations ($2209 for child support and $1795 for tuition, totaling $4004). Thus, under Kim's request, after those obligations are paid, she is $5508 short of her requested spousal support—likely the rationale behind the district court's award.

After considering the parties' positions, we affirm the district court's award of $5500 per month in spousal support. We consider this a hybrid award that allows an economically dependent spouse, through a limited time, to maintain the family's lifestyle and yet, meet the goal of facilitating economic independence. *See id.* at 185–86 (combining the goals of both traditional and rehabilitative spousal support).

*Child Support.*

Only Kim submitted a child support worksheet, requesting monthly child support of $2214. In the decree, child support was set at $2209 per month using Brent's annual income at $347,898. Her worksheet showed a credit for the spousal-support award of $5500 per month. Again, Brent requests that his income of $203,932 be used to calculate child support, along with a deduction for the spousal support he is ordered to pay. As noted above, we find the averaged income imputed to Brent correctly considered the business conditions his company faces. Finally, Brent also asserts that the district court imputed no income to Kim

---

[9] The $9512 amount consists of $1795 for private school tuition, $4066 for the mortgage payment on the marital home, $850 toward Kim's vehicle expense, $587 for Kim's credit card, and $2214 for child support.

and did not consider her spousal support. As noted above, the reality is that, on the record made, Kim does not net any income from her separate interests and the parties agreed to the current situation. And because the child support award is so close to what Kim calculated, after adding the spousal support paid to her, it appears the district court did consider the spousal support in making its award. *See In re Marriage of Flattery*, 537 N.W.2d 801, 803 (Iowa Ct. App.1995) (noting that before utilizing earning capacity rather than actual earnings to calculate child support, the "court must make a finding that, if actual earnings were used, substantial injustice would result or that adjustments would be necessary to provide for the needs of the child[ren] and to do justice between the parties" (citation omitted)). We affirm the child support award in the decree.

**Payment for Children's Private School Tuition.**

During the pendency of the dissolution-of-marriage proceedings, Brent paid private school tuition of $1795 per month for the two children under a temporary stipulation. In the decree, after determining that the children should continue at the same private school for the "entirety of their education," the district court ordered Brent to pay "any and all costs related to the children's attendance" at the school. To land there, the court noted Brent agreed to the obligation.[10] Brent says this is not so. In his appellate brief, he says he offered to continue paying the tuition but was not contemplating paying all of it and, no matter what percentage

---

[10] To further advance the district court's understanding, Brent did say in his proposed decree filing, "Brent shall be obligated to pay, directly to the school, the tuition for both minor children to attend until they each graduate or the parties mutually consent to either or both transferring to a different school." To be fair, in that same filing, Brent limited the monthly spousal support award to $2000.

he must pay, the court erred by not considering the obligation alongside the spousal-support award. We start by looking at what he said at trial; in response to the question what he thought was "a fair alimony award," Brent testified he "want[ed] to pay . . . for the children to continue to go to [private school]" and he thought "[he's] okay with" and "[could] afford to pay, you know, part of Kim's mortgage."

Now, with this court-ordered obligation before him, Brent argues he should have a credit on his spousal-support obligation of "no less than $900 or half of the monthly tuition" or, in the alternative, require Kim to pay one-half of the tuition. True, as a part of their pre-divorce discussions, these parents agreed the children should attend private school, so the extra expense for tuition should be factored into what is fair between the parents. Likewise, the phrase used by the district court here—"any and all costs related to their attendance"—could be read as a blank check.

On her end, Kim argues the district court set child support by the guidelines but then considered Brent's testimony that he agreed he would pay the private tuition. She points to his statement that he "want[ed] to pay . . . for the children to continue to go to [private school]." She maintains he should be held to his testimony defining the agreement and that he has the means to do so. Yet at trial, Kim also testified that her request for spousal support of $9512 could be reduced by the obligation for the children's tuition, reducing it to a $7753 monthly spousal-support payment.

For guidance on this question, we look to cases that have addressed private school education costs. "The amount of support determined by the guidelines is

designed to encompass the normal needs of a child, except for medical support and postsecondary education expenses." *Heiar*, 954 N.W.2d at 473. Those normal needs have included educational costs for the children, even considering tuition might be higher at a private school. *See In re Marriage of Fite*, 485 N.W.2d 662, 664–65 (Iowa 1992). In *Fite*, the supreme court vacated the requirement that the father pay 45% of the private school tuition and did not deviate from the child support guidelines to accommodate those increased expenses. *Id.* These educational expenses required by the district court to be split are those types of financial obligations normally incurred by other children and, thus, have been factored into the child support guidelines. *See id.*

Ordinarily we would not decrease Brent's child-support obligation to cover these expenses or make other adjustments without a showing that application of the support guidelines are unjust. *See In re Marriage of Anglin*, No. 06-0028, 2006 WL 2419125, at *3 (Iowa Ct. App. Aug. 23, 2006) (requiring the custodial parent to overcome the presumptive correctness of the guideline amount for child support because "[a]ttendance at a nonpublic school does not necessarily require an upward deviation from the child support guidelines"); *In re Marriage of Nobis*, No. 04-2069, 2005 WL 2757171, at *2 (Iowa Ct. App. Oct. 26, 2005) (finding no basis to require payment of the parochial school expenses when considering the payor's income and considering the child support entered covered education costs); *In re Marriage of Steffen*, No. 98-2059, 2000 WL 145038, at *2 (Iowa Ct App. Feb. 9, 2000) (noting although the parents historically enrolled the children in private school the payor was not required to pay one-half the tuition as the record on earnings and cost of tuition was inadequate to make that determination and the

court made no finding the guideline amount was unjust). But here, Brent voiced an agreement to pay the tuition or at least part of it. Thus, this case involves the imposition of additional support payments for the private school—not a deviation from the child support guidelines. *See In re Marriage of Gordon*, 540 N.W.2d 289, 292 (Iowa Ct. App. 1995) (holding the child support guidelines balance the needs of the children against the legitimate needs and expenses of the payor parent and, absent a finding the guidelines are unjust or inappropriate, the payor parent will not be required to pay an additional support order for clothes, school supplies, and summer recreation activities).

So somewhat similar to *In re Marriage of Thul*, where the payor requested the *child support* be reduced so he could afford one-half of the private school tuition cost, Brent argues that if the court requires him to pay all tuition, he should get a credit against his *spousal-support obligation*. *See* No. 15-1029, 2016 WL 3003464, at *2–3 (Iowa Ct. App. May 25, 2016). In *Thul*, the district court deviated downward from the child support guidelines because it determined that the father did not have "income available to pay the amount of [spousal support] and child support being sought." *Id.* at 3. We know of no case that takes that approach as to spousal support, as we view tuition as part of the costs of raising the children. *See In re Marriage of Mills*, 983 N.W.2d 61, 72 (Iowa 2022) (noting child support and spousal support are separate and distinct).

Here, no one requested that we reduce the child support award or provided the requisite proof that the child support guidelines were unjust, so we decline to modify the decree. Because Brent agreed to cover the tuition, we affirm the ruling

of the district court requiring Brent to pay the private school tuition, but we modify the language of the decree to limit the obligation to only the tuition expense.

**Obligation for the Expense of Extracurricular Activities.**

We take a similar approach to our analysis of the responsibility for the extracurricular activity expenses as we did with the private school tuition issue, although Brent did not voice any agreement to covering these specific expenses. Except for two activities, the district court ordered Brent and Kim to equally split expenses for extracurricular activities, but Brent disputes he should have to pay even one-half of the costs. On those expenses Brent was required to pay 100% of the cost, one activity was club volleyball, which required a $1900 sign-up fee and would involve future travel costs and other expenses; the other activity was an annual $2000 outlay for drum lessons. Brent asserts Kim should have to cover all extracurricular activity expenses and the district court erred by requiring him to fund any of these activities. Kim asserts the district court "did deviate from the child support guidelines while ordering Brent to pay [the extracurricular] expenses" and thus, "[t]here was no error."[11]

Crafting a fairness theory, Brent argues he pays child support so to pay even more on top of that obligation is unfair. Generally, child support calculated under our guidelines are designed to provide an amount of funds that will "cover the normal and reasonable costs of supporting a child." *Heiar*, 954 N.W.2d at 473. We find the expenses for the athletic endeavors and musical training are those

---

[11] In the section of her appellate brief responding to this issue, we note Kim failed to cite to any legal authority for her position. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

that fall within the normal realm of childrearing expenses contemplated by the child support guidelines. *See McDermott*, 827 N.W.2d at 685–86; *see also Gordon*, 540 N.W.2d at 292 ("[E]xpenses for clothes, school supplies and recreation activities are considered under the guidelines, and a separate support order covering such expenses is improper absent a finding that the guidelines amount would be unjust or inappropriate."). Thus, because normally the extracurricular expenses would be part of the general expenses covered by the child support payment, we modify the district court ruling to require that Kim be responsible for all costs of all extracurricular activities, including the club volleyball expenses and the drum lesson costs, unless otherwise agreed upon by the parents.

**Waukee Home Net Equity.**

To set up separate households, Brent and Kim sold the jointly owned Clive marital home, netting $218,017. Brent bought a home in Grimes that he was renting and, after the rent he had paid was applied as a down payment ($53,000), his net equity equaled $74,264. But for Kim and the children, the parties jointly purchased a home in Waukee for $630,000 and paid $113,909 from the Clive house proceeds as a down payment. After application of the down payment, Kim placed the home's net equity at $117,243. Brent was also on the mortgage loan for this property. The district court awarded the Grimes home to Brent and the Waukee property to Kim with the requirement she refinance the mortgage.

Brent requests alternative relief over the treatment of the marital home sale and purchase of the Waukee home. In his view, the court should have awarded him 50% of the net equity in the Waukee house or 50% of the net proceeds from the sale of the marital home property. To start with the first alternative, Brent

asserts that under the terms of the premarital agreement he was deemed to be a 50% owner of the Waukee home and he was a joint titleholder so the district court erred by not awarding him one-half of the equity in the home. We are perplexed by this argument, as Kim included the net equity of the Waukee home in her property division proposal, listing it as a marital asset. And the district court treated it as such. So based upon the property division award, the net equity of the Waukee house was considered, along with all other marital property. We decline to award Brent any additional funds under this theory.

As for the second suggested relief involving the division of the Clive marital home net equity ($218,017), we know Brent used $30,000 to pay back income taxes. If the district court had correctly awarded him one-half of the equity from the marital home, Brent argues he is owed $79,008.50, deducting the payment he already received. At trial, each party disputed who spent the remaining funds from the sale of the family home, and Brent voiced an agreement that Kim could use around $18,000 for moving and house items. The district court determined both used these funds to set up their new homes and that Kim also used $31,641 to pay off a credit card balance. Rather than addressing this issue here, we choose to consider the total property award, not in the view of each separate property, but as a general overview of what is equitable considering all of the assets and debts. *See McDermott,* 827 N.W.2d at 678 (noting to find the divisible estate, the first task is to identify and value all marital assets subject to division). In that view, we turn to the property distribution and the equalization payment.

**Property Division Equalization Payment.**

After considering all of the various arguments over how monies were spent and how the property was divided, the district court calculated a property division award and ordered Brent to pay $73,538 to Kim to equalize the division. In his post-trial filing, Brent advocated for an equalization award to him of $164,950.79.[12] But in his appellate filing he requests a payment of $79,008 (net proceeds from the sale of the family home) or, in the alternative, $36,233.50.[13] Plus, Brent asks us to order Kim to pay $34,250 towards one-half of the line-of-credit debt.

While the district court did not prepare a spreadsheet approach to the assets and liabilities for our review, the district court offered this explanation for its equalization award in its factual findings:

> Kim continued to utilize credit cards and loans from her mother to pay for family expenses above and beyond what Brent agreed to pay for under the Temporary Matters Stipulation and agreement. Kim's expenses during the pendency of this matter include a Chase Visa account in the amount of $24,517.00 [and] Gap Visa account in the amount of $5,280.00. Kim also used $12,100.00 from her Luana Savings account and as mentioned previously $31,641.00 of the net proceeds from the sale of the house to pay on a credit card for family expenses totaling $73,538.00.

Our task is to determine if this payment represents an equitable division of the marital assets. To do equity in a division of assets, the award need not necessarily

---

[12] Brent reached this sum by adding all of the following: half of the debt on a line of credit Brent was ordered to pay ($34,250); half of the net value of the furniture ($50,000); half of the Waukee home equity ($58,621.50); and half of the joint proceeds from the sale of the marital home ($52,079.29 minus $30,000 tax payment = $22,079.29).

[13] This amount is reached by taking the net equity from the sale of the marital home ($218,017) less the amount paid for a down payment on the Clive home ($113,909) and less the amount used to pay the credit card balance ($31,641), totaling $72,467, of which Brent requested half ($36,233.50).

be equal. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021) ("Iowa is an equitable distribution jurisdiction."). The division is also guided by Iowa Code section 598.21(5) (2018).

Here, the district court balanced all of the interests involved, such as property brought into the marriage and the parties' premarital agreement to fashion an equitable division. Yet, because we do not have the benefit of how the district court calculated the net equity distribution between the parties, our review is more difficult. And with the various positions advocated at different points in the proceedings, this seems like a moving target. "[W]e examine the entire record and adjudicate anew the issue of property distribution." *McDermott*, 827 N.W.2d at 676. But we observe that once the provisions of the premarital agreement were enforced, the parties had little to divide outside of debt. After reviewing the only proposed distribution of assets and liabilities, filed by Kim, and the parties' financial affidavits, the parties' net equity in the marital assets and debts reported are within $21,000 of each other. We factored in the equity in each party's new home and the debts the parties listed in the affidavits and proposed division, but we did not account for the net proceeds from the sale of the marital home as those went towards family expenses during the long tenure of these proceedings, even though Kim used most of those funds. Based upon our calculations, we modify the property equalization payment to require Brent to pay Kim the sum of $21,000.

**Personal Property Division.**

In this case, the district court found the parties "placed no limits on their personal spending during the marriage," which resulted in the accumulation of very nice personal possessions. In fact, Brent testified that, in the home Kim retained,

the furniture was valued at $130,000 and in his home, he had furnishings valued at $30,000. Thus, as for the difference of $100,000, Brent asserts the district court failed to consider the home furnishings value to be, at a minimum, $100,000 and he should have been awarded half of those furnishings or, in the alternative, $50,000 in cash. To divide these items, the district court awarded the personal property in the party's possession to remain with that party. But as Kim testified, Brent's other personal possessions, such as his shoe collection, were valuable as well. We will not disturb the district court's personal property division as it was considered in the overall property division award we have already addressed.

**Award of Trial Attorney Fees to Kim.**

Claiming an abuse of discretion by the district court, Brent maintains the requirement he pay a $75,000 attorney fee award to Kim was unfair to him. *See In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997) ("An award of attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion."). To make his point, Brent lists reasons for the large attorney bill and asserts that 95% of those unnecessary charges related to issues Kim created.[14] Kim argues the opposite—Brent's

---

[14] He lists:
> (1) cancellation of [his] deposition four . . . times by Kim or her counsel; (2) the [p]arties worked together without attorneys to reach custody agreements and each time Kim got upset and refused to move forward at least three different times; (3) Kim copied three . . . attorneys on each communication with her counsel, which she would send multiple times a day, resulting in numerous duplicate billings; and (4) Kim's insistence on having an expert witness evaluate the business and the resulting hours upon hours in attorney fees resulting from work completed that clearly was not relevant based on the existence of the pre-marital agreement.

The actual billing submitted through ten days of trial equaled $121,000.

behavior was the reason for all of the attorney time. In a dissolution-of-marriage case, we are not surprised that attorney fees might be higher because the parties are acrimonious. And, while we might see with hindsight from the perspective of our bench how we could keep fees more reasonable, here, the trial court could best view if fees were necessary and reasonable after hearing from the parties and their counsel. In the attorney-fee-award analysis over what is fair and reasonable, we look to the parties' financial positions. *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 663 (Iowa 1989). Given the disparity in income, the complexity of issues, and Brent's ability to pay, we find no abuse of discretion with the award of trial attorney fees to Kim.

**Kim's Issues on Cross-Appeal.**

**Kim's Property Division Concern—Five Star Mason City, LLC (FSMC).**

Kim argues the district court erred by failing to value Brent's 20% interest in FSMC and consider it in the property division. In the decree, the district court awarded Brent all right, title, and interest in FSMC. The district court noted,

> Exhibit A [in the premarital agreement] does not include specifically [FSMC] a real estate holding company that owns a building in Mason City, Iowa that houses a [Five Star] store. Brent is a 20% owner of [FSMC]. Brent showed income from [FSMC] on his tax filings of $11,197.00. The Parties did not offer any evidence on the value of [FSMC]. Further, no evidence was offered as to how [FSMC] was formed and whether Brent had an additional investment to acquire his interest in [FSMC].

While testimony was not offered as to the value of FSMC by any expert, Brent identified a value of $81,000 in his sworn answers to interrogatories that were made part of the trial record. This number was bolstered by Kim in her motion to reconsider, when, using Brent's January 2019 affidavit, she reminded the court

that he reported a FSMC net value of $406,392.36.[15]  Then, in an updated pre-trial affidavit, Brent valued his FSMC interest as $97,628.47.

Using the lower value, Kim argues her property division award is short and she should be awarded a cash payment of $40,600 (half of the $81,200).  Brent counters with two points: (1) neither party testified about the valuation of the flooring business and although he included a value in his affidavits of financial status, the valuation was "unknown" and (2) FSMC was covered by the premarital agreement so it was not part of the division.  *See In re Marriage of Hansen*, No. 17-0889, 2018 WL 4922992, at *3 (Iowa Ct. App. Oct. 10, 2018) (enforcing premarital agreements to carry out the intent of the parties); *see also* Iowa Code § 596.5. The language referenced by Brent from the premarital agreement is:

> RELINQUISHMENT BY KIMBERLY. . . .  Specifically, in the event the marriage relationship results in separation, termination by dissolution, or ceases by the death of Brent, Kimberly hereby waives all rights of dower, curtesy, homestead, distributive share, right of election against a Will, widow's allowances, any spousal rights to separate property which may accrue in a dissolution of marriage, and any other marital right arising by virtue of statute or otherwise, in and to the separate property Brent now owns or *may hereafter acquire*.
> 
> . . . .
> 
> OWNERSHIP AND MANAGEMENT.  Kimberly and Brent shall each retain, individually and separately, the ownership, legal title, management, and control of all property now owned *or hereafter acquired by each of them respectively*, whether real or personal property, and all increases and additions thereto, shall remain entirely free and clear of any right, title, interest or claim by the other which would otherwise accrue upon the solemnization of their contemplated marriage.

(Emphasis added).

---

[15] That 2019 affidavit confirmed a value of $960,627.39 encumbered by a debt of $554,235.  Brent's 20% interest in the net value would equal $81,200.

We agree with Kim that Brent's assessment of value is sufficient for evidentiary purposes but, in the ruling on Kim's motion to reconsider, the district court denied her request to consider the value of FSMC in the division of joint property "for the reasons stated in [Brent's] resistance."  And there, Brent made the same points he makes here.  As to his second argument, after applying the terms of the premarital agreement, we find the intent was that unless property held at the time of signing or acquired after was placed in joint ownership, that asset would be retained by the owner.  So as to FSMC, as Brent argues, the district court properly set it aside and did not include it in the division of the marital property.  We deny Kim's request to treat FSMC as a marital asset to divide and affirm the trial court's treatment of this asset.

**Kim's Request for Appellate Attorney Fees.**

Considering the merits of the appeal and that each party prevailed to some extent, we deny Kim's request for payment of all of her appellate attorney fees and instead require that Brent pay one-half of the reasonable fees to defend the decree in her appeal.  Brent should not have to pay any attorney fees attributed to issues she raised on her cross-appeal.  Thus, we remand to the district court to determine a reasonable award under these parameters.  *See Heiar*, 954 N.W.2d at 473.

**Conclusion.**

We affirm the district court on most issues raised by these parties, but modify the decree to limit the obligation for the private school to only the tuition cost, require Kim to pay the costs of the children's extracurricular activities, and reduce the property equalization payment to $21,000.  Finally, we remand to the

district court to determine the appropriate award of reasonable appellate attorney fees for Kim.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED AND REMANDED ON CROSS-APPEAL.**